VAN BUNCH
(*Admitted Pro Hac Vice*)
vbunch@bffb.com
T. BRENT JORDAN
(*Admitted Pro Hac Vice*)
bjordan@bffb.com
**BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, P.C.**
2325 E. Camelback Road, #300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Fax: (602) 274-1199

DEBRA BREWER HAYES
(*Admitted Pro Hac Vice*)
dhayes@dhayeslaw.com
CHARLES CLINTON HUNTER
(Cal. Bar. #93987)
**THE HAYES LAW FIRM, PC**
700 Rockmead, Suite 210
Kingwood, TX 77339
Telephone: (281) 815-4963
Fax: (832) 575-4759

WILLIAM ANDERSON
(*Admitted Pro Hac* Vice)
wanderson@cuneolaw.com
**CUNEO GILBERT & LADUCA,
LLP**
507 C Street, NE
Washington DC 20002
Telephone: (202) 789-3960
Fax: (202) 789-1813

*Attorneys for Plaintiffs
(Additional Counsel Listed on
Signature Page)*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GEORGE WILLIAMS, LORENDA OVERMAN, GERALD CHIARIELLO II, CHARLES PENCINGER, STEVE OETEGENN, BRIAN GILDERMAN, JOSEPH RAMOS, ADAM DANIEL JACKS, MARK D.** | Case No.: 2:13-cv-05066-BRO-VBK **DEMAND FOR JURY TRIAL** **SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR:** |

1  COOPERMAN, GERALD L.
   WASHINGTON, ERNEST PAUL
2  CAMILLERI, JR., SCOTT
   MARKOWITZ, JOE DiORIO,
3  THOMAS BLATT, MATTHEW J.
   BONZELLA, JOE GARSETTI,
4  PHILIP KIRSOPP, WILLIAM
   KRATZ, WILLIAM NEFF and
5  JAMES R. KRAPF, on behalf of
   themselves and all others similarly
6  situated,

7        Plaintiffs,

8  v.

9  YAMAHA MOTOR
   CORPORATION, U.S.A.,
10
11        Defendant.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.  VIOLATION OF CALIFORNIA
    CONSUMERS LEGAL
    REMEDIES ACT, Cal. Civ. Code
    § 1750, et seq.;
2.  VIOLATION OF CALIFORNIA
    UNFAIR COMPETITION LAW,
    Cal. Bus. and Prof. Code §17200
    et seq.;
3.  VIOLATION OF
    MASSACHUSETTS
    CONSUMER PROTECTION
    ACT;
4.  VIOLATION OF NEW YORK
    GENERAL BUSINESS LAW
    SECTION 349;
5.  VIOLATION OF NORTH
    CAROLINA UNFAIR AND
    DECEPTIVE TRADE
    PRACTICES ACT;
6.  VIOLATION OF
    WASHINGTON CONSUMER
    PROTECTION ACT;
7.  VIOLATION OF THE
    FLORIDA UNFAIR AND
    DECEPTIVE TRACE
    PRACTICES ACT; AND
8.  VIOLATION OF THE TEXAS
    DECEPTIVE TRADE
    PRACTICES ACT
9.  VIOLATION OF THE RHODE
    ISLAND UNFAIR TRADE
10. VIOLATION OF THE
    VIRGINIA CONSUMER
    PROTECTION ACT
11. VIOLATION OF THE
    MARYLAND CONSUMER
    PROTECTION ACT
12. VIOLATION OF THE NEW
    JERSEY CONSUMER FRAUD
    ACT
13. VIOLATION OF THE
    CONNECTICUT UNFAIR
    TRADE PRACTICES ACT

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................... 1

JURISDICTION AND VENUE ................................................................. 7

PARTIES ................................................................................................... 7

TOLLING OF THE STATUTE OF LIMITATIONS FOR CONSUMER
FRAUD ................................................................................................... 11

    *Operation of the Discovery Rule* ............................................. 11

    *Yamaha's Shifting of the Blame of its Customers* ..................... 11

YAMAHA'S TRANSACTIONS WITH AUTHORIZED DEALERS
RESULTED IN SALES TO CONSUMERS ............................................ 12

THE HIDDEN DRY EXHAUST DEFECT IN THE
FIRST GENERATION OUTBOARDS ................................................... 13

PLAINTIFFS' FIRST GENERATION OUTBOARDS SUFFERED
FROM THE DRY EXHAUST DEFECT ................................................. 15

    Plaintiff George Williams ........................................................ 15

    Plaintiff Lorenda Overman ...................................................... 16

    Plaintiff Gerald Chiariello ....................................................... 18

    Plaintiff Charles Pencinger ...................................................... 20

    Plaintiff Steve Oetegenn .......................................................... 21

    Plaintiff Brian Gilderman ........................................................ 23

    Plaintiffs Joseph Ramos and Adam Daniel Jacks ................... 25

    Plaintiff Mark D. Cooperman ................................................. 26

    Plaintiff Gerald L. Washington ............................................... 27

    Plaintiff Ernest Paul Camilleri ................................................ 28

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiff Scott Markowitz ............................................................. 29

Plaintiff Joe DiOrio.................................................................... 30

Plaintiff Thomas Blatt................................................................. 32

Plaintiff Matt Bonzella ............................................................... 34

Plaintiff Joe Garsetti .................................................................. 35

Plaintiff Phillip Kirsopp.............................................................. 35

Plaintiff William Kratz ............................................................... 36

Plaintiff William Neff ................................................................ 37

Plaintiff James R. Krapf ............................................................. 37

YAMAHA KNEW OF THE DRY EXHAUST DEFECT
BEFORE PLAINTIFFS PURCHASED ...................................... 38

  *Yamaha's Presale Knowledge Dates Back to the Roll Out of the First
  Generation Motors and Thus is Presale Knowledge with Respect to All
  Class Members*............................................................... 38

  *Early Consumer Complaints Show Presale Knowledge* ........................... 40

  *Early Repairs, Replacement Orders and Warranty Claims Show
  Presale Knowledge* ...................................................... 42

  *The Circumstances Regarding the Development of the Second Generation
  Shows Presale Knowledge*......................................... 43

  *Early Active Concealment Shows Presale Knowledge*............................ 50

THE DRY EXHAUST DEFECT MANIFESTED DURING A TIME WHEN THE
REASONABLE CONSUMER WOULD STILL BE USING THE CLASS
MOTORS   ............................................................... 53

YAMAHA HAD A DUTY TO DISCLOSE THE DRY EXHAUST DEFECT
DUE TO ITS UNREASONABLE SAFETY RISK .............................. 54

  *Risk of an On-Board Fire* ......................................................... 54

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

*Risk of a Boat Accident and Associated Casualties, or Other On-Board Injuries* ................................................................................. 57

*Causal Nexus Between the Corrosion and Engine Failure* ....................... 58

*Causal Nexus Between Engine Failure and Risk of Boat Accident* .......... 60

CLASS ALLEGATIONS ................................................................. 62

COUNT I - VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT ........................................................................ 67

COUNT II - VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ..................................................................... 68

COUNT III - VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT ...................................................................... 70

COUNT IV - VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 .............................................................................. 72

COUNT V - VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ............................................. 73

COUNT VI - VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT ...................................................................... 75

COUNT VII - VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT .................................................... 76

COUNT VIII - VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT ............................................................................ 77

COUNT IX - VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT ...................... 78

COUNT X - VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT ...................................................................... 79

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT XI - VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT ............................................................................... 79

COUNT XII - VIOLATION OF THE NEW JERSEY CONSUMER FRAUD
ACT ...................................................................................................... 80

COUNT XIII - VIOLATIONS OF CONNECTICUT UNFAIR TRADE
PRACTICES ACT .................................................................................. 81

PRAYER FOR RELIEF ..................................................................................... 83

JURY TRIAL DEMANDED ............................................................................... 83

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs George Williams, Lorenda Overman, Gerald Chiariello II, Charles Pencinger, Steve Oetegenn, Brian Gilderman, Joseph Ramos, Adam Daniel Jacks, Mark D. Cooperman, Gerald L. Washington, Ernest Paul Camilleri, Scott Markowitz, Joe DiOrio, Thomas Blatt, Matthew J. Bonzella, Joe Garsetti, Philip Kirsopp, William Kratz, William Neff and James R. Krapf (collectively "Plaintiffs" or the "Named Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege as follows:

1.    This is a class action brought by Plaintiffs, on behalf of themselves and other similarly situated persons, against Yamaha Motor Corporation, U.S.A. ("YMUS" or "Yamaha").   Plaintiffs seek damages and equitable remedies for themselves and the Class (defined in ¶ 265 below).

2.    This case involves unequivocal evidence, as fully detailed and categorized herein, that Yamaha knew about, but did not disclose, the material fact that its first-generation line of four stroke outboard motors,[1] manufactured from the 2000 model year to the 2004 model year, contained a hidden defect. These defective motors were sold as new between 2000 and 2005 or later and thereafter in the aftermarket. The 2000 to 2004 model year engines are referred to herein as the "First Generation Outboards" or the "Class Motors."

3.    Yamaha introduced the First Generation Outboards in a self-proclaimed pioneering move of creating a four stroke outboard motor of over 200 horsepower. Unfortunately, as described below, an inherent design defect in the Class Motors caused severe corrosion to develop in internal component parts not

---

[1] Outboard motors consist of an engine, gearbox, and propeller or jet drive joined together in a compact, self-contained unit.   Mounted on the transom of a boat, an outboard motor is the most common method used for propelling small watercraft and provides the means of steering the boat.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

visible from the outside or even when Class Motors were opened up for routine service. As documented in an article in the October/November 2012 edition of BoatUS Magazine (the "BoatUS Magazine article"), owners had great difficulty in identifying the corrosion before their engines inevitably failed, stating "sometimes the damage can only be discovered with a special tool called a borescope that's snaked up inside, and even then the technician has to know what to look for."[2]

4.     The First Generation Outboards included a new "In-Bank Exhaust System" layout that positioned the exhaust system inside the motor body. Conventional outboard motor design routes hot exhaust gases around the outside of and away from critical internal components. However, Yamaha's "pioneering" design pushed these gases in a much shorter "dry side exhaust" channel through such critical components as the oil pan and a "water jacket" cooling array.  The shorter length of the exhaust system meant higher exhaust gas temperatures and greater risk of failure.   The severe corrosion occurred specifically in and resulted from Yamaha's defective design in the dry exhaust system and its component parts (hereinafter the "Dry Exhaust Defect").

5.     The corrosion occurred in the dry side exhaust, separate from where water passages exist to allow water through to reduce heat and keep the engine cool.  These dry side exhaust parts contained at most only a primer coat of paint, which provides negligible to no corrosion protection.   They contained no anodizing oxide layer or any other protective layer other than mere paint.  There was no protective coating on either the inside or the outside of the dry exhaust parts.  This made the dry exhaust susceptible to the premature corrosion suffered

---

[2]  See,  http://www.boatus.com/magazine/2012/october/Yamaha-F225-Corrosion-Complaints.asp (last checked on February 1, 2015)

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

by Plaintiffs and the Class members.  Yamaha engineers designed these deficiencies into the First Generation Outboard Motors.

6.     The unexpected onset of rapid corrosion would not occur but for the Dry Exhaust Defect.  With no anodizing oxide layer or any other protective coating, the exposure to salt water vapor, corrosive chemicals in the exhaust gases, higher temperatures caused by the shorter in-bank exhaust, and the oxygen-deprived environment of the dry side exhaust, created the "perfect storm" for the development of corrosion.  In contrast, cooler temperatures and an oxygen-rich environment in other parts of the engine resulted in no comparable corrosion (including the cooling water tubing, also known as the "wet side" to the exhaust and the separate idling exhaust system).

7.     Thus, the defect in the design of the First Generation Outboards, particularly the substandard protection and coating on the affected internal parts, inevitably led to the need for an expensive overhaul, running as high as $12,000 per motor.  Absent overhaul, the corrosion to the dry exhaust would inevitably cause the engines to fail, and in fact some of the Plaintiffs' and Class members' engines did fail as the result of the corrosion, as further detailed herein.

8.  Engine failure, whether as the result of corrosion or for any other reason, is a serious safety issue by Yamaha's own admission.  As Yamaha warns in its owners' manuals for the First Generation Outboards, engine failure causes a sudden change of speed which can throw occupants forward or even overboard, and the loss of ability to control or steer the boat.  Yamaha makes these warnings in its owners' manuals in bold print and with use of a Safety Alert Symbol and "WARNING" spelled in capital letters.  Early in the owners' manuals, Yamaha makes clear that its use of the Safety Alert Symbol and "WARNING" in all caps concerns matters that are related to safety.  Yamaha's owners' manuals for the

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

First Generation Outboards state that the Safety Alert Symbol "means ATTENTION!  BECOME ALERT!  YOUR SAFETY IS INVOLVED!", and further state, "Failure to follow WARNING instructions <u>could result in severe injury or death</u> to the machine operator, a bystander, or a person inspecting or repairing the outboard motor." (Emphasis in original).

9.      The internal components at issue failed prematurely and early in the useful life of the outboards often after only 500 to 700 hours of use and despite proper service and maintenance. With a properly designed engine, problems with exhaust bank corrosion begin, if at all, only much later and would not interfere with the operation of the engine during its expected useful life. A properly designed outboard motor carries an expected useful life of at least 2000 engine hours.

10.      Yamaha should have discerned the defect during the design phase known as Failure Modes Effects and Analysis and clearly during accelerated corrosion testing, both of which are standard techniques used by competent engineers.  As early as the initial release in 2000-2001, however, Yamaha clearly knew about the defect, both from its buyer survey returns and the numerous complaints lodged by buyers. Yamaha even established a customer service center in Kennesaw, Georgia for the express purpose of handling complaints.  Yet Yamaha did nothing to alert purchasers or to fix the problem, other than developing and selling, beginning in 2002, a replacement "kit" through its dealers. Indeed, Yamaha did quite the opposite: instead of issuing a recall, it expressly instructed its customer service representatives to falsely blame the customer for improper fresh water flushing, when it knew that any failure to follow this recommended procedure was not the cause of the corrosion (in any event, Plaintiffs properly flushed their engines). Instead of issuing a technical service

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

bulletin, Yamaha sent field representatives to inspect motors from customers who pushed the issue and falsely blamed improper maintenance.  For the very few customers who both discovered the defect during the 3 year limited warranty period and pushed the issue past the field representatives, Yamaha provided warranty service, yet still continued selling the faulty motors.

11.    The replacement "kit" contained new replacement dry exhaust parts. These new parts used different and new corrosion protection, including anodized aluminum and chemical conversion coatings important for corrosion resistance. Moreover, Yamaha also developed and introduced "Second Generation" models in or about 2005 with a completely revamped and re-engineered corrosion protection system that included: (1) the same additional corrective corrosion-proof coatings contained in the kit parts; (2), new engine design improvements to reduce the impact of the concentrated hot exhaust gases rushing through the shortened muffler and manifold system and resultant risk of corrosion, including at least 10 sacrificial anodes not existent in the First Generation Outboards; and, (3) new and improved maintenance recommendations, including inspection of the dry exhaust system, to catch any dry side exhaust corrosion earlier in the life cycle of the engine.

12.    Yamaha introduced engines with the improvements in corrosion protection starting with the 2005 model year.  As Yamaha developed these new parts and new engines, it concealed its knowledge about the Dry Exhaust Defect from Class members, and simultaneously marketed, sold and profited from the "kit" of replacement parts that were subject to the Defect, all the while continuing to sell and market First Generation Outboards as if there was nothing wrong.

13.    The existence of the Dry Exhaust Defect was material information because the reasonable consumer would attach importance to its existence or

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

5

nonexistence in determining their course of action in the decision to purchase one of the First Generation Outboards.  The presence of the Dry Exhaust Defect meant that the Outboards would have a shorter useful life span, absent a major overhaul costing thousands of dollars per engine, than reasonable consumers would expect, as well as posed an unreasonable risk of serious injury in the event of failure.

14.     Plaintiffs have been damaged by Yamaha's concealment of the defective condition of the First Generation Outboards, because they were misled into purchasing outboard motors of a quality and value different than they were promised, were forced into paying repair and replacement costs that they would not have otherwise paid and are now stuck with used motors that have no resale value.

15.     Notwithstanding the exorbitant repair and overhaul costs borne by its customers, Yamaha refused to provide a remedy.[3]  Despite timely demand, to date Yamaha has refused to fully repair or offer replacement parts or replacement of the defective Class Motors. Plaintiffs therefore bring this action on behalf of themselves and a proposed Class of similarly situated purchasers of Yamaha's First Generation Outboards.

---

[3] The complaints lodged with its Consumer Protection Bureau led BoatUS to undertake a series of negotiations with Yamaha on a program to address the corrosion issue. However, although Yamaha agreed to obtain service records from BoatUS members experiencing a problem, and make a determination on a case-by-case basis, most members were ignored, denied assistance or offered only an extended warranty if a new motor was purchased. Yamaha's program did nothing to remedy the losses of the Class Members. In fact, many members reported simply being told by Yamaha that it disclaimed liability for the Defect because the claims came after warranty expiration, despite the inherent design defect known to Yamaha to have caused the corrosion to begin with the first use of the motor.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

6

1

## JURISDICTION AND VENUE

2

16.     This Court has subject matter jurisdiction of this action pursuant to

3

28 U.S.C. §1332 of the Class Action Fairness Act of 2005 because: (i) there are

4

100 or more class members, (ii) there is an aggregate amount in controversy

5

exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal

6

diversity because at least one plaintiff and Yamaha are citizens of different states.

7

This Court has supplemental jurisdiction over the state law claims pursuant to 28

8

U.S.C. § 1367.

9

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391

10

inasmuch as the unlawful practices are alleged to have been committed in this

11

District, and Yamaha has its principal place of business in this District, and

12

regularly conducts business in this District.

13

## PARTIES

14

18.     During all times relevant to this suit, Plaintiff George Williams

15

("Williams") has been a resident of the State of Washington, and currently resides

16

in Seattle, Washington.  Plaintiff purchased a Class Motor after Yamaha knew

17

about, but did not disclose, the Defect.

18

19.     During all times relevant to this suit, Plaintiff Lorenda Overman

19

("Overman") has been a resident of the State of North Carolina, and currently

20

resides in Goldsboro, North Carolina. Plaintiff purchased a Class Motor after

21

Yamaha knew about, but did not disclose, the Defect.

22

20.     During all times relevant to this suit, Plaintiff Gerald Chiariello II

23

("Chiariello") has been a resident of the State of New York, and currently resides

24

in Glen Cove, New York. Plaintiff purchased a Class Motor after Yamaha knew

25

about, but did not disclose, the Defect.

26

27

28

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21.     Plaintiff Charles Pencinger ("Pencinger") was a resident of the Commonwealth of Massachusetts during all times relevant to this suit until August 17, 2014, when he relocated to North Carolina.  He currently resides in Hertford, North Carolina.  Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

22.     During all times relevant to this suit, Plaintiff Steve Oetegenn ("Oetegenn") has been a resident of the State of California, and currently resides in San Marcos, California. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

23.     During all times relevant to this suit, Plaintiff Brian Gilderman ("Gilderman") has been a resident of the State of Florida, and currently resides in Miami, Florida. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

24.     During all times relevant to this suit, Plaintiff Joseph Ramos ("Ramos") has been a resident of the State of California, and currently resides in San Diego County, California. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

25.     During all times relevant to this suit, Plaintiff Adam Daniel Jacks ("Jacks") has been a resident of the State of California, and currently resides in San Diego County, California. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

26.     During all times relevant to this suit, Plaintiff Mark Cooperman ("Cooperman") has been a resident of the State of New York and currently resides in Plainview, New York. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

27.     During all times relevant to this suit, Plaintiff Gerald L. Washington ("Washington") has been a resident of the State of Florida and currently resides in Cape Coral, Florida. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

28.     During all times relevant to this suit, Plaintiff Ernest Paul Camilleri, Jr. ("Camilleri") has been a resident of the State of Nevada and currently resides in Verdi, Nevada, but also maintains residences in the State of California, where he purchased, used and repaired his Class Motors.

29.     During all times relevant to this suit, Plaintiff Scott Markowitz ("Markowitz") has been a resident of the State of Texas and currently resides in Houston, Texas. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

30.     During all times relevant to this suit, Plaintiff Joe DiOrio ("DiOrio") has been a resident of the State of Rhode Island and currently resides in North Providence, Rhode Island. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

31.     During all times relevant to this suit, Plaintiff Thomas Blatt ("Blatt") has been a resident of the State of Virginia and currently resides in Bowling Green, Virginia. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

32.     During all times relevant to this suit, Plaintiff Matthew J. Bonzella ("Bonzella") has been a resident of the State of Maryland and currently resides in Davidsonville, Maryland. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

33.     During all times relevant to this suit, Plaintiff Joe Garsetti ("Garsetti") has been a resident of the State of New Jersey and currently resides in

Sparta, New Jersey. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

34.     During all times relevant to this suit, Plaintiff Philip Kirsopp ("Kirsopp") has been a resident of the State of Connecticut and currently resides in Lebanon, Connecticut. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

35.     During all times relevant to this suit, Plaintiff William Kratz ("Kratz") has been a resident of the State of Maryland and currently resides in Glen Burnie, Maryland. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

36.     During all times relevant to this suit, Plaintiff William Neff ("Neff") has been a resident of the State of Connecticut and currently resides in Lebanon, Connecticut. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

37.     During all times relevant to this suit, Plaintiff James R. Krapf ("Krapf") has been a resident of the state of Maryland and currently resides in Annapolis, Maryland. Plaintiff purchased a Class Motor after Yamaha knew about, but did not disclose, the Defect.

38.     Defendant YMUS operates as a wholly-owned subsidiary of Yamaha Motor Co., Ltd. ("YMC"), a Japanese corporation, for the exclusive importing, marketing and sale of YMC products.  YMUS is a corporation organized and existing under the laws of the State of California and has its principal place of business at 6555 Katella Avenue, Cypress, California 90630.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

1

**TOLLING OF THE STATUTE OF LIMITATIONS**

2

**FOR CONSUMER FRAUD**

3

***Operation of the Discovery Rule***

4

39.     As more fully detailed herein, Plaintiffs and the members of the Class

5

could not have discovered through the exercise of reasonable diligence that their

6

First Generation Outboards were defective within the time period of any

7

applicable statute of limitations.  Among other things, due to the location of the

8

internal parts experiencing corrosion, Plaintiffs did not and could not have

9

performed a visual inspection that would have revealed the Defect, nor is it

10

reasonable to presume that any member of the Class could have performed such a

11

visual inspection.  Indeed, the most straightforward way to identify the Defect

12

requires professional removal of the power head, a time-consuming and unusual

13

process that can cost hundreds of dollars per motor to perform and one that was

14

neither recommended nor performed in the course of routine maintenance for the

15

First Generation Motors, but is now recommended to be done after the engine has

16

been 1000 hours in use.

17

***Yamaha's Shifting of the Blame to its Customers***

18

40.     As more fully detailed herein, any applicable statute of limitations

19

that might otherwise apply to bar any of Plaintiffs' claims or the claims of the

20

other Class members is equitably tolled by Yamaha's suppression of facts and

21

complaints once consumers began raising the issue as early as 2001. Yamaha

22

suppressed the fact that the exhaust systems on its supposedly "innovative" new

23

product line were inevitably failing due to rapid onset corrosion by adopting a

24

policy to shift false blame to consumers.  Yamaha trained its customer and field

25

service personnel to claim failure to flush the motors with fresh water caused the

26

problem when Yamaha knew the Defect inhered in the Motors' design and could

27

28

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

not even be flushed with fresh water. Meanwhile, as an additional insult to its customers, Yamaha reaped additional profits by selling its repair "kit" consisting of properly coated and more corrosion-proof versions of the bad parts in question.

## YAMAHA'S TRANSACTIONS WITH AUTHORIZED DEALERS RESULTED IN SALES TO CONSUMERS

41.    Yamaha marketed and sold a large volume of the First Generation Outboards through central offices in Cypress, California to a nationwide network of authorized dealers pursuant to standardized Dealer Agreements.   The First Generation Outboards were sold to the dealers as a finished product.   Indeed, Yamaha did not sell the First Generation Outboards directly to consumers, but rather, through its network of authorized dealers.

42.    Pursuant to the standard Dealer Agreements, Yamaha appointed its authorized dealers as retail sales and service locations for its products, in other words, to act as sales operations in selling the motors to the public, subject to Yamaha's close supervision and control.   Yamaha also made the dealers responsible for the performance of warranty service and for providing other assistance to Yamaha customers.

43.    Between 2000 and at least as late as 2006, if not later, the authorized dealers sold defective engines to Plaintiffs and other members of the Class either as current model year engines or as model year leftovers.

44.    Yamaha phased out the marketing and sales of the First Generation Outboards gradually beginning in 2005.  This occurred because in 2005, Yamaha introduced and began to sell a second generation of newly designed four stroke models.

45.    Yamaha's warranty for the First Generation Outboards obligated the dealer to: complete warranty registration, act on behalf of Yamaha to receive

warranty claims, make warranty inspections, complete paperwork required by Yamaha and make warranty repairs.

46.     In its welcoming letter to customers who purchased a Yamaha Extended Service ("YES") warranty, Yamaha represented that the purchased motor was "factory backed by a nationwide network of authorized Yamaha dealers." Yamaha supplied dealers with essential and proprietary instruments, equipment and training, including correspondence and on-site training courses. Dealers are only certified after Yamaha has reviewed and approved a prospective dealer's capabilities to provide retail sales and service of Yamaha products. Dealers are not franchisees, but they are licensees subject to Yamaha's supervisory visits and control over their daily operations (including hours, facilities, display and inventory) and business policies (including sales promotions, treatment of customers, and manner of advertising). Yamaha conducts periodic evaluations of the Dealers' performance based on reported criteria such as sales volume and inventories.

## <u>THE HIDDEN DRY EXHAUST DEFECT IN THE</u>
## <u>FIRST GENERATION OUTBOARDS</u>

47.     The photographs below depict new Class Motor dry exhaust components on the left and faulty corroded ones on the right:

 

48. As the BoatUS Magazine article reported, First Generation Outboards repeatedly and almost universally experienced the specific problem that after 500 to 700 hours of use, the engine exhaust gases corrode the exhaust system and sometimes also the engine's oil pan, which is in the same area. The BoatUS Magazine article quotes an interview with a marine surveyor: "I've seen the damage to six engines myself, and know of least a dozen others in the New Jersey area."

49. The same surveyor told BoatUS Magazine that the failure wa*s **not outwardly visible**. This is entirely consistent with Plaintiffs' experiences, as the dry exhaust corrosion problem was not visible to them absent the disassembly of their outboard engines. According to the surveyor, the engine may lose power and begin to smoke, and in some cases, the oil dipstick can be blown out of the engine from the exhaust gas pressure.

50. Proper maintenance would not detect the internal dry side exhaust corrosion. Yamaha service manuals for the First Generation Outboards contained no instruction to inspect for corrosion in internal dry exhaust components during annual maintenance checks. Thus, the hidden buildup of corrosion would not be discovered, even by trained mechanics performing annual service checks, until the engines actually began to fail and evidence symptoms such as leaking oil, giving

the mechanic a reason to open up the engine. External examination and even scoping of the exhaust tubes cannot reliably detect the internal corrosion absent disassembly of the engine and removal of the power head.

51.     BoatUS members have reported that the problems with internal corrosion to the dry exhaust internal component parts were not outwardly visible, even to those making inspection with the aid of flashlights. It has consistently been reported by owners that the internal corrosion was only visible upon professional disassembly.

52.     Repair or replacement of corroded parts in First Generation Outboards involves significant cost to consumers such as Plaintiffs and the other members of the Class.  Further, once the corrosion problems were detected, some consumers incurred the premature expense of purchasing a new outboard engine. In some cases, owners reported being faced with repair estimates totaling 50% of the cost of simply abandoning the defective outboard and purchasing a new engine from the dealer.  One owner reported in an online post that, faced with severe corrosion to both of his twin First Generation Outboards, he spent $34,000 to replace the engines with new ones, discarding the old engines after only 500 hours of use.

## PLAINTIFFS' FIRST GENERATION OUTBOARDS SUFFERED FROM THE DRY EXHAUST DEFECT

### Plaintiff George Williams

53.     Plaintiff Williams purchased a boat equipped with a new First Generation Four Stroke Outboard (Yamaha model number F200), from Jacobsen's Marine in Seattle, Washington, one of Yamaha's authorized dealers of new Yamaha outboards, on September 6, 2003.   Williams used his outboard approximately 650 hours between September 6, 2003 and November 15, 2011, or

around 81.25 hours per year, with regularly scheduled service. Williams otherwise followed all recommended maintenance procedures for his First Generation Four Stroke Outboard engine.

54.     On November 15, 2011, while at sea, Williams noticed that his boat was leaking flammable engine oil, and he brought the boat in to Jacobsen's Marine for service and inspection.

55.     Williams was told he likely needed replacement of his oil pump on his outboard.  When the mechanic took the engine head off to begin the oil pump replacement, he discovered severe corrosion damage to internal dry exhaust engine components.  In the end, Williams paid a repair invoice in the total amount of $3,011,91, which included a $1,001.10 charge for parts and labor incurred to replace the corroded oil pan, exhaust manifold, and other dry exhaust component parts.

56.     Plaintiff Williams would not have purchased his engine if Yamaha had not concealed the existence of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Lorenda Overman**

57.     Plaintiff Overman purchased a new Yamaha F225 TXRD First Generation Four Stroke Outboard from one of Yamaha's authorized dealers on February 3, 2005, in North Carolina.  Overman used her outboard approximately 512 hours between 2005 and 2011, or about 85.33 hours per year, with regularly scheduled service, following recommended maintenance procedures.

58.     In September 2011, while at sea nearby the Cape Lookout Lighthouse near Core Banks, North Carolina, the buzzers in the cabin started to go off and the boat changed speeds and began to slow.  Her F225 engine started to

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

overheat and promptly failed due to corrosion brought on by the Dry Exhaust Defect.

59.    When the engine failed, Overman lost steering control of her boat. She reported that when the engine power was lost, the "rudder and steering . . . that all stopped."

60.    After about an hour and a half of waiting for a tow, Overman and her guests were rescued through her towing service and towed back to shore.

61.    Overman brought her boat and failed F225 outboard engine for service to 70 West Marina, in Morehead City, North Carolina. 70 West Marina is an authorized Yamaha Dealer and/or Service Center.  After inspecting the engine, 70 West Marina immediately contacted Yamaha about the problem, but was told that the warranty had expired on Overman's outboard motor.

62.    Specifically, 70 West Marina inspected the engine by removing the power head and the lower unit, at which time Overman's mechanic discovered that the engine was blown.  According to her mechanic, the wall between the dry exhaust and the wet exhaust had corroded through to the point that water from the wet exhaust was invading the dry exhaust.  According to the repair estimate, the corrosion to internal components included a "rotten" exhaust tuner and a hole in the exhaust housing.

63.    The dry exhaust failure caused the engine to overheat and blow up. It had to be completely overhauled.  The mechanic called Yamaha and sought to purchase one of the repair kits designed specifically to address the corroded parts, but one was not available and was on back order for six months.  The mechanic had to patch the hole between the dry and wet exhaust with a metal alloy.  He also had to replace the water pump that failed because the water was not circulating properly since it was running into the dry side of the exhaust.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

64.     On October 20, 2011, Overman paid her final total repair bill related to the corrosion problem that caused her engine failure in the amount of $3,118.44.   Overman was also deprived of the use of her boat for an extended period of time in the fall of 2011 as a result of the failure and substantial repairs.

65.     Overman later communicated with Yamaha in an effort to get relief for the engine failure and corrosion related repairs, but after requesting repair records from Overman in June 2013, Yamaha offered no remedy and did not return Overman's voicemail messages.  70 West Marina also attempted to have the repairs covered by Yamaha's warranty, but to no avail.

66.     Indeed, Yamaha's customer service representative in Kennesaw, Georgia, told Plaintiff Overman the corrosion problem was her fault – that she had to flush the engine after every use. Overman had flushed her motor after every use with fresh water, but to no effect, as the corrosion was on the dry side of the motor.

67.      Plaintiff Overman would not have purchased her engine if she had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in her purchase.

**Plaintiff Gerald Chiariello**

68.     Plaintiff Chiariello purchased a new Yamaha F225 TXRD First Generation Four Stroke Outboard on May 6, 2006, from Great Oak Marina in St. James, New York, one of Yamaha's authorized dealers.   Chiariello's outboard engine was a model year leftover and was a first-generation model manufactured in 2004 before Yamaha's design change, and according to its Certificate of Origin, was first transferred to a Yamaha distributor for sale on August 19, 2004.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

18

69.    Chiariello bought the engine because of Yamaha's reputation which he considered at the time to be "bullet proof" based on what he had gathered over the years at boat shows he attended and at which Yamaha presented.

70.    Chiariello used the outboard approximately 380 hours between May 2006 and March 2012, or 63.33 hours per year, had the engine serviced regularly and followed all recommended maintenance procedures, exclusively using Yamaha parts and fluids.

71.    In March 2012, after reading on the Internet about widespread dry exhaust corrosion problems with First Generation Outboards, while performing a water pump change, Chiariello removed the lower unit himself and examined his engine with the aid of a bore scope and camera.  With this extreme measure of the disassembly of the lower unit and with the aid of these special visual tools, Chiariello was able to detect several areas of complete corrosion all the way through the exhaust chamber.

72.    Plaintiff Chiariello very shortly thereafter had an inspection conducted at Alhambra Marine, an authorized Yamaha Service Center in Seaford, New York.  After an examination confirmed the rampant corrosion to the dry exhaust chamber, Chiariello had the F225 outboard repaired at a total cost of $2,574.88.

73.    Plaintiff Chiariello then wrote a letter to Yamaha explaining the corrosion damage and repairs.  Yamaha and its representatives denied any assistance or relief, taking the position that his engine was no longer covered by the YMUS warranty.

74.    Then, on April 5, 2012, Chiariello submitted a proof of loss form to his insurer claiming that damage to his motor was a mechanical failure due to manufacturer's defect.  The insurer appointed a marine surveyor to inspect the

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

motor.  The surveyor's opinion was that the damage to the motor was a result of "poor design."  The insurer paid Chiariello's claim, but not the full amount of his loss.

75.     Plaintiff Chiariello would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Charles Pencinger**

76.     Plaintiff Pencinger purchased two First Generation Outboards from a bank who had repossessed them from the original purchaser, specifically a 2003 F225 TXRB model and a LF225 TXRB model, in September 2010, in Massachusetts.

77.     At all times, Pencinger had the outboards regularly serviced and maintained, consistent with Yamaha's recommendations.

78.     Like Chiariello, around March 2013 Pencinger reviewed an Internet discussion of widespread dry exhaust corrosion problems with First Generation Outboards.  Although no corrosion was outwardly visible without disassembly of the engine, and although there had been no prior warning signs that his engine was suffering from corrosion, Pencinger decided that he should inspect his motor.

79.     In March 2013, Pencinger opened up his outboard engine by dropping the lower units, and by this extreme measure thus was able to perform an internal inspection.

80.     With the dropping of the lower units, Pencinger discovered severe internal corrosion to the dry exhaust chambers and promptly took the engine in for service and inspection.

81.     In April 2013, Pencinger had the two F225 engine repaired for a total cost of $3,908.63 by mechanics at an authorized Yamaha Service Center.

82.     Pencinger attempted to seek relief from Yamaha and spoke with one of Yamaha's representatives; however, he was informed that his motors were out of warranty and that there was nothing Yamaha would do for him.

83.     Plaintiff Pencinger would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Steve Oetegenn**

84.     Plaintiff Oetegenn purchased two used 2004 First Generation Outboards in 2006 in California from a private seller.  Oetegenn requested and received a change of registration on YMUS's extended warranties on the outboards, which transferred the extended warranties to Oetegenn as a subsequent purchaser.

85.     At all times, Oetegenn had the outboards regularly serviced and maintained on an annual basis and consistent with Yamaha's recommendations.

86.     On May 14, 2012, during a sea trial while Oetegenn was about to close the sale of his boat, one of his outboard engines began to emit blue smoke but remained operational.  He returned to harbor and took the boat to be serviced at Boating Dynamics, a company operated by a boat technician specializing in Yamaha outboard engine repairs and tune-ups.

87.     The service technician at Boating Dynamics told Oetegenn that ***both*** engines had suffered severe corrosion to the dry exhaust components and that a repair would cost up to $12,000 per engine, because the corrosion to the dry exhaust had been so severe that the power heads had been adversely affected with corrosion in the power head cylinder block, and thus repair would require the extreme measure of replacement of the power heads also.  The Boating Dynamics

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

technician told Oetegenn that the engine had burned oil and was about to fail entirely.

88.     At the time of the discovery of the corrosion, Oetegenn's First Generation Outboards had only 500 hours of use, or 62.5 hours per year.

89.     Rather than undergo the $24,000 repair on the outboards, Oetegenn elected on May 30, 2012, to purchase two new F225 outboards from an authorized Yamaha dealer in Ventura, CA, at a total cost of $31,337.62.

90.     Oetegenn wrote two letters to Yamaha to request assistance, but no relief was forthcoming.  Yamaha and its representatives contended that because his engines were out of warranty after the extended warranties expired, the company would not help him.

91.     As part of an insurance claim, Oetegenn received a report on the damage from an experienced NAMS Certified Marine Surveyor with many years of experience and exemplary credentials.  He submitted a Survey Report to Boat U.S. Marine Insurance on August 24, 2012, which opined on the cause, nature and extent of the damage to Oetegenn's engines and whether they could continue to be safely operated.

92.     The surveyor reported that the problem in the starboard side outboard occurred because corrosion from the dry exhaust system had eaten a hole through the wall of the exhaust manifold allowing oil from the crankcase to be pumped into the exhaust. Specifically, the mating flanges on the cylinder block and the lower unit upper casing exhaust guide were corroded through and there was heavy corrosion pitting to the exhaust guide, exhaust manifold and other internal surfaces.

93.     The surveyor also noted that the port side outboard, the one that had not failed, had similar heavy corrosion pitting in the exhaust manifold, the exhaust

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

guide, into the exhaust passages and at the mating flange which would allow seawater from the cooling passage to enter the exhaust passages.

94.     The surveyor determined that the dry exhaust passages had been badly damaged and the cooling passages breached due to severe corrosion and thus that both of Oetegenn's engines had sustained a catastrophic failure.

95.     Plaintiff Oetegenn would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Brian Gilderman**

96.     On or about October 3, 2003, Plaintiff Gilderman purchased a nearly-new Stamas Tarpon 29 boat through a broker in Florida.  The boat used two 2002 Yamaha F225 Four Stroke Motors with very low hours of approximately 120 each.

97.     Not long after his purchase, Gilderman purchased the YES warranty extension conferring a financial benefit directly upon Yamaha.  In purchasing the YES warranty Gilderman expected that Yamaha would operate in good faith and provide adequate disclosures and warnings concerning the Class Motors, which they did not. Namely, Yamaha failed to warn Plaintiff of or fairly warrant the Dry Exhaust Defect present in the Class Motors.  Additionally, despite its knowledge of the Dry Exhaust Defect before, or, at minimum, during the term of the YES warranty, Yamaha failed to disclose this information to Gilderman.

98.     Gilderman's Class Motors, which he still owns, bear identification numbers 69K-X-000514 and 69J-X-000933.  The motors have approximately 950 hours of use each, or 105.5 hours per year.

99.     Gilderman has had all Yamaha recommended regular maintenance conducted by a Yamaha certified technician.   In addition, Gilderman has

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

habitually flushed the motors after use and kept the boat out of the water on a lift when not in use.

100.    In or around June 2013, as a result of online postings and an article by Boat US, Gilderman became concerned about potential failure in his Class Motors. Gilderman had also noticed starting in fall 2012 a small amount of oil leaking from his engines, but Plaintiff had been unable to determine the source. On or around July 29, 2013, Plaintiff brought his boat to Bob Hewes Boats, a Yamaha authorized sales and service center located in North Miami, Florida. Removal of the power head from his Class Motor revealed severe corrosion in both Class Motors.  The pictures below are of Gilderman's Class Motors: *Note sunlight visible through a crack in the dry exhaust.*

 

101.    Gilderman contacted Yamaha directly and sought assistance on or about July 30, 2013.  Despite Plaintiff Gilderman's requests, Yamaha failed to disclose its knowledge of the Defect and refused to provide him any assistance.

102.    Gilderman subsequently paid $3699.99 to repair the Dry Exhaust Defect in both of his Class Motors.  Bob Hewes Boats, a certified Yamaha Service Center, completed the repairs.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

24

103.    Gilderman would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiffs Joseph Ramos and Adam Daniel Jacks**

104.    On or about July 25, 2011, Plaintiffs Ramos and Jacks purchased a used First Generation Four Stroke Outboard, specifically a Model Year 2004 Yamaha F225 motor, in California from a private seller.  At the time of purchase, the motor had only 300 hours of lifetime use.

105.    On or about April 15, 2012, after less than 100 hours of additional use, the motor experienced a catastrophic failure due to the Dry Exhaust Defect. Ramos and Jacks were out in the bay near San Diego when their Class Motor began to sputter and lose power.  When the engine lost power, they lost the ability to control the boat.  Ramos and Jacks could not steer the boat, which gradually slowed and drifted to a stop.

106.    Ramos' and Jacks' engine was cutting in and out like it was out of gas, but when they checked the gas they found the tank was full.  They were able to get the engine started again and get back to the dock.  However, the engine kept failing on and off again as they slowly ventured back to the dock.  Each time the engine lost power, again the ability to control the boat was dangerously lost.

107.    When Ramos and Jacks got back to the dock, they pulled the engine apart and found the oil was milky white, which they concluded was because there was water mixed in with the oil.  Later, they received a repair estimate from Boating Dynamics, which is operated by a boat technician specializing in Yamaha outboard engine repairs and tune-ups.

108.    The Yamaha-trained specialist at Boating Dynamics inspected the engines and told them that the failure had been caused by a hole caused by severe

corrosion, which had allowed water from the wet exhaust to leak into and invade the dry exhaust side.  The repair invoice notes that the "cylinder head and engine block corroded away."

109.  The failure of Plaintiffs Ramos and Jacks' Class Motor required the purchase of a replacement motor at a cost of approximately $23,000.00.

110.  Plaintiffs Ramos and Jacks would not have purchased their engine if they had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

### Plaintiff Mark D. Cooperman

111.  In July 2005, Plaintiff Mark D. Cooperman purchased two new Model Year 2005 Yamaha F225 motors from an authorized Yamaha Dealer in New York.  Along with his purchase, Cooperman acquired YES extended warranties on the motors, which expired on July 8, 2011.

112.  Plaintiff Cooperman properly maintained and properly used his motors consistent with recommendations of the Owners' manuals.  He flushed his motors with fresh water after every use.  Despite this care and use, one of his motors failed in April 2013 after only about 700 hours of use, or 87.5 hours per year.

113.  Cooperman had both motors disassembled at Spellman's Marine on April 19, 2013.  Spellman's Marine is an authorized Yamaha dealer.  Spellman's Marine performed the disassembly to "address [a] corrosion problem" and repair the engines at a cost of approximately $7,000.  Since that time, Cooperman has experienced additional related problems with the motors' power heads, which were rotting from the inside out, brought on by the original severe corrosion problem.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

114.   Although Plaintiff Cooperman contacted Yamaha he has had no relief from Yamaha and was not reimbursed for the cost of his significant repairs.

115.   Plaintiff Cooperman would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

## Plaintiff Gerald L. Washington

116.   In October 2003, Plaintiff Gerald L. Washington purchased two Model Year 2004 Yamaha F225 outboard motors from an authorized Yamaha Dealer in Florida, the location where his boat and its motors have been kept continuously since then.  At the time of purchase, the motors were new and had virtually no hours of lifetime use.  Washington is the original owner of his motors.

117.  Along with his engines, Washington purchased YES extended warranties that expired in 2009.

118.   The boat on which Washington's motors are attached is stored on a lift and has never been left in the water overnight.   After each use, Mr. Washington flushes the motors thoroughly with fresh water.

119.   One of the reasons Washington purchased his motors is his previous good experience with Yamaha products (a motorcycle and a snowmobile).

120.   Washington properly maintained and properly used his motors consistent with recommendations of the Yamaha Owners' manuals.  For example, he changed the synthetic oil of the motors every 50 hours, changed the gear oil regularly, changed the plugs every 100 hours, and had the motors routinely serviced.

121.   Despite all of this care and maintenance, with a little over 200 hours of use on the engines, or around 20 hours per year, Washington was informed in the Spring of 2013 by a marina mechanic not to run his engines, as they had "the

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

corrosion problem," referring to the by then well-known problems with the First Generation Outboards detailed throughout this Complaint and for which Yamaha has made no remedy.

122. The marina mechanic specifically explained to Washington after coming to his home to inspect the motors that his starboard engine would not shift into gear. Washington is informed and thereon alleges that the corrosion blocked the engine's shaft from moving.

123. Plaintiff Washington discovered the corrosion when he was unable to shift the Starboard engine into gear and found a small amount of oil leaking from the Port engine. The corrosion of his two motors was not visible without disassembly of the motors. Washington contacted Yamaha directly regarding the problem but was told only that he could purchase a repair kit for each motor at a cost of $695 each.

124. Plaintiff Washington would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Ernest Paul Camilleri**

125. In 2010, Plaintiff Ernest Paul Camilleri purchased two used Model Year 2003 Yamaha F225 motors in California, where he kept and used them. He purchased from the original private owner, who had advertised them for sale in Nevada. At the time of purchase, the motors had only 230 hours of lifetime use.

126. Plaintiff Camilleri properly maintained and used his Yamaha motors consistent with the recommendations in his owner's manual. Despite this care and use, he discovered corrosion on his engine on October 25, 2012, when he had the motors inspected after reading the BoatUS magazine article on widespread

corrosion in the First Generation Outboards.  At the time, his engines had only 300 hours of use each, or only 33.3 hours per year.

127.   Plaintiff Camilleri had the service department of Gone Fishing Marine of Dixon, California, do the inspection.  Gone Fishing Marine is an authorized Yamaha Dealer and Service Center.  Gone Fishing found corrosion on the Camilleri engines using a bore scope. The corrosion was not visible to the naked eye.

128.   Gone Fishing repaired the corrosion damage to Camilleri's motors at a cost of $5,975.45.  Camilleri asked Yamaha to pay for the cost of the repair, as did the dealer.  Yamaha refused both requests.

129.   Plaintiff Camilleri would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

### Plaintiff Scott Markowitz

130.   In 2009, Plaintiff Scott Markowitz purchased two Model Year 2003 Yamaha F225 motors from MarineMax, an authorized Yamaha Dealer.  At the time of purchase, the motors were used but had only 138 hours of lifetime use.

131.   Both of Markowitz's First Generation Outboards suffered engine failure, but these failures occurred at different times.

132.   At about the 350 hour mark, the first of Markowitz's First Generation Outboards failed while he was at sea on the Gulf of Mexico on December 13, 2012.  There were no warning signs – the engine just quickly died and would not restart.

133.   Markowitz's regular mechanic, who specialized in Yamaha engines and had a wealth of expertise in repair and servicing of Yamaha outboards, examined the failed engine and determined that it had suffered a catastrophic

failure as the result of severe corrosion that had allowed sea water to get into the oil pan.  Specifically, after the water and the oil began to mix, there was no longer any lubricant remaining in the motor, and it failed.  The mechanic was familiar with the problem having heard that Yamaha had problems with the First Generation Outboards.

134.   Markowitz had the failed engine repaired at significant expense and returned to sea.  However, at about the 430 hour mark, the second of Markowitz's First Generation Outboards also failed on June 14, 2014.  This failure happened while Markowitz was still at the dock.  Once again, Markowitz had his regular mechanic inspect and perform repairs, and it was determined that the failure had occurred due to rapidly developing internal corrosion to the dry exhaust component parts.

135.   The total cost of corrosion repair to Markowitz was in excess of $24,000.  The repairs were performed at an authorized Yamaha Service Center.

136.   Plaintiff Markowitz would not have purchased his First Generation Outboards if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Joe DiOrio**

137.   On or about October 5, 2007, Plaintiff Joe DiOrio purchased a used Model Year 2003 Yamaha F225 motor from its single previous owner in Rhode Island.  At the time of the purchase, the motor had only 750 hours of lifetime use.

138.   DiOrio is informed and believes and on that basis alleges that the motor had been properly maintained and properly used consistent with recommendations of the owners' manual by its previous owner and was properly

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

maintained at all times by Plaintiff DiOrio, who also routinely serviced the motor consistent with recommendations in the owners' manual.

139.   DiOrio experienced problems with the motor around the 800 hour mark when it began to overheat while idling or slowly trolling.  On these multiple occasions, DiOrio would need to shut the engine off and allow it to cool down for ten to fifteen minutes before it could be restarted.  During this time, DiOrio's boat was immobilized.

140.   Due to the circumstances of how he used his Yamaha outboard, DiOrio was concerned for his safety in each instance that the boat overheated. Because he fishes in an area that is heavily populated, when the overheat alarms went off he was typically in heavy boat traffic and immobilized.

141.   Continually facing safety issues with the use of his boat due to the need to power off the engine and concerned about the mysterious overheating problem, DiOrio had the motor inspected by an authorized Yamaha dealer, Mill Creek marine of North Kingston, Rhode Island, on or about July 3, 2014, when the motor had approximately 900 hours of running time on it, or 122.2 hours per year.

142.   The experienced mechanics at Mill Creek had expertise in Yamaha outboard motors and in fact had previously replaced corroded parts on multiple occasions from First Generation Outboards. DiOrio selected Mill Creek to inspect his motor because of their experience in dealing with the corrosion issue in First Generation Outboards and their training by Yamaha.

143.   Upon inspection, the mechanics at Mill Creek discovered corroded parts in the dry exhaust of DiOrio's engine.  The corrosion was not visible unless the motor was disassembled.  The mechanics diagnosed that the corrosion had caused a hole between the dry exhaust and the wet exhaust, allowing enough

water to leak through the corrosion hole that there was not enough water circulating through the wet exhaust to keep the engine cool.

144.   The cost of repair of the damage done by the internal corrosion was $2,288.40, paid by Plaintiff DiOrio.  The repairs were completed by Mill Creek.  The Yamaha replacement part "kit" was purchased and the new parts used in the repairs.  Yamaha refused to cover the cost of repairs.

145.   Plaintiff DiOrio would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

### **Plaintiff Thomas Blatt**

146.   In May of 2004, Plaintiff Thomas B. Blatt III purchased two new Model Year 2004 Yamaha F225 motors from Southeastern Marine, an authorized Yamaha dealer in Virginia whose repair and service technicians have experience and expertise in Yamaha outboards.

147.   Plaintiff Blatt properly maintained and used his Yamaha motors consistent with the recommendations in his owner's manual.  Despite this care Blatt's Port motor began to overheat.  Specifically, Blatt was in the harbor in Urbanna, Virginia, on his way to his destination moving through a no-wake zone, when the warning alarm in the cockpit of his boat signaled that his port side engine was overheating.  Three days later, the overheat alarm went off again.

148.   After two overheating warnings, Blatt decided to have the port engine inspected at Southeastern Marine. Opening up the dry exhaust, the mechanic discovered severe corrosion in the motor.  Below is a picture of one of the corroded parts:

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    149.   The Yamaha certified mechanic at Southeastern Marine determined
17  that the corrosion was specifically the cause of the overheating, and that the
18  engine was at risk of total failure without repair.  Blatt's mechanic informed him
19  that it would be just a matter of time before water invaded the oil and the engine
20  would blow.

21    150.   Eventually, Blatt had the engine repaired on December 21, 2009, at a
22  cost of over $6,400.  At the time of repair, the engine had only about 600 hours of
23  use, or 120 hours per year.

24    151.   When the corrosion damage was discovered, Southeastern Marine
25  contacted Yamaha to inquire whether the company would cover the cost of
26  repairs.  However, Yamaha refused to allow the repairs to be performed under the
27  Yamaha warranty, contending that it had expired.
28

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

152.   Later, shortly after the repairs were completed, Blatt spoke to a Yamaha representative personally.  He was falsely told that improper flushing was the cause of his problem.  He remembers asking the Yamaha representative why flushing would make a difference since the corrosion began on the dry exhaust side, but the Yamaha representative had no response.

153.   Plaintiff Blatt would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

### Plaintiff Matt Bonzella

154.   In April 2008, Plaintiff Matt Bonzella purchased two used Model Year 2002 Yamaha F225 motors from a private seller.

155.   Bonzella properly maintained and used his Yamaha motors consistent with the recommendations in his owner's manual. Despite this care, he discovered that the motors had corroded and repaired them on May 13, 2013.  At this time, the motors had about 875 hours of usage, or approximately 80 hours per year. The corrosion was not visible without disassembly of the motors.

156.   Bonzella had the motors repaired by Tri-State Marine of Deale, Maryland, a Five Gold Star Certified Yamaha dealer, at a cost of $5,357.24.

157.   Bonzella reported the corrosion problem with his engines to Boat US, whom he is informed and believes reported the problem to Yamaha.  Bonzella was contacted by Yamaha by telephone about the corrosion problem and offered an oil kit, which he refused.  Otherwise, Yamaha contributed or offered to contribute nothing to the repair of the corrosion damage to his engines.

158.   Plaintiff Bonzella would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Joe Garsetti**

159.   In April 24, 2009, Plaintiff Joe Garsetti purchased a used Model Year 2003 Yamaha F225 motor from William W. Shuster, Jr., in a private sale conducted in New Jersey.  Shuster bought the motor new in June 2003.  Garsetti acquired the motor along with an extended YES warranty that expired after six years of coverage, on June 18, 2009.  The motor had only 150 hours of use when Garsetti bought it in 2009, or only about 25 hours of use per year.

160.   Garsetti properly maintained and used his Yamaha motor consistent with the recommendations in his owner's manual.  Despite this care, he discovered that the motor had corroded when he had it inspected at Gone Fishing Marina, which is on information and belief an authorized Yamaha dealer, on or about September 27, 2013, after reading articles and forum pieces online about the corrosion experienced by other owners of similar Yamaha motors.  At this time, Garsetti's motor had about 275 hours of usage, or about 30 hours per year since the time of Garsetti's purchase. The corrosion was not visible without disassembly of the motor.

161.   The marina's mechanic found that parts in the dry exhaust on Garsetti's motor were corroded, necessitating that Garsetti repair and rebuild the motor at a cost of approximately $2,774, paid by Garsetti.

162.   Plaintiff Garsetti would not have purchased his engine if he had known of the Dry Exhaust Defect. Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff Phillip Kirsopp**

163.   Plaintiff Kirsopp purchased a pre-owned boat equipped with a First Generation Outboard in Massachusetts in 2008. Specifically, Mr. Kirsopp purchased a 2002 Yamaha F225 from a Yamaha-authorized dealer/retailer.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

164.   When Mr. Kirsopp purchased the motor, it was approximately five years old and had only 350 hours of use on it.

165.   After the motor had accumulated approximately 500 hours of total use, Kirsopp experienced engine problems and discovered internal corrosion of exhaust components.

166.   Plaintiff Kirsopp was forced to pay several thousand dollars to replace the motor's exhaust.   Kirsopp was thereby damaged by Defendant's practices.

167.   Plaintiff Kirsopp would not have purchased his engine if he had known of the Dry Exhaust Defect.   Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff William Kratz**

168.   Plaintiff Kratz purchased his First Generation Outboard in Maryland in 2005, specifically a 2003 Yamaha F255.   Kratz purchased from a Yamaha-authorized dealer/retailer that is certified on Yamaha's website as "Five Star Gold Certified," "Master Technician," and "Yamalube Exclusive Service Center."

169.   When Mr. Kratz purchased the motor, it was approximately two years old and had only 90 hours of use on it.   At the time of purchase, Yamaha's factory warranty was transferred to Mr. Kratz.

170.   After the motor had accumulated approximately 970 hours of total use, Plaintiff Kratz experienced engine problems and discovered the internal corrosion while inspecting the motor with a boroscope.

171.   Plaintiff Kratz was forced to pay nearly one thousand dollars to repair the corrosion-based issues.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

172.   Plaintiff Kratz would not have purchased his engine if he had known of the Dry Exhaust Defect.  Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff William Neff**

173.   Plaintiff Neff purchased a First Generation Outboard in Rhode Island in 2008, specifically a 2002 Yamaha F225.

174.   After the motor had accumulated approximately 475 hours of total use, Plaintiff Neff experienced engine problems and discovered internal corrosion.

175.    Plaintiff Neff was forced to pay several thousand dollars to replace the motor's corroded oil pan, exhaust manifold, and other component parts.

176.   Plaintiff Neff would not have purchased his engine if he had known of the Dry Exhaust Defect.  Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

**Plaintiff James R. Krapf**

177.   Plaintiff Krapf purchased a boat and two First Generation Outboards from a private party in Maryland in 2010. Specifically, he purchased 2002 Yamaha F225 motors.

178.   In connection with his purchase, Plaintiff Krapf read the Yamaha owner's manual and associated materials, which failed to warn him of any concerns relating to internal corrosion.

179.   When Plaintiff Krapf later learned of the corrosion concern on older motors, he chose to have an authorized Yamaha mechanic inspect the motors, even though each motor had only accumulated approximately 700 hours of total use.  This inspection resulted in replacing the exhaust manifolds on both motors at a cost of more than $3,000 for each motor.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

180.   Plaintiff Krapf would not have purchased his engine if he had known of the Dry Exhaust Defect.  Yamaha's concealment of the Dry Exhaust Defect played a substantial part and was a substantial factor in his purchase.

## YAMAHA KNEW OF THE DRY EXHAUST DEFECT BEFORE PLAINTIFFS PURCHASED

***Yamaha's Presale Knowledge Dates Back to the Roll Out of the First Generation Motors and Thus is Presale Knowledge with Respect to All Class Members***

181.   Yamaha has exclusive access and control over engineering, research and testing data developed in 1999 or earlier, prior to the final design and manufacture of the outboards in 2000.

182.   However, on information and belief, Yamaha knew or should have known of the Dry Exhaust Defect at the time of the roll out of the First Generation Outboards in 2000 based on standard principles of competent engineering product design.

183.   Yamaha knew or by the exercise of reasonable care should have known and had reason to know of the Dry Exhaust Defect at the time of roll out of the model year 2000 Class Motors as the result of its pre-market testing procedures, pre-release testing data and engineering research related to the dry exhaust system.  This is because:

> i.   Before the release of a combustion engine in the marketplace, a risk analysis (i.e., analysis of the likelihood of the failure, the severity of the consequences, and the ability of user to either predict or detect the possibility of engine failure) should be and is an integral part of any standard design research;

ii.  For marine engines, corrosion is a key aspect of failure and risk analysis because it is well known and established in the industry that it can lead to engine failure and other associated problems;

iii.  Risk analysis of the possibility of corrosion is especially important whenever the product is expected to be operated in difficult environments, including exposure to salt water, high temperatures, corrosive chemicals (including but not limited to ions from the exhaust as well as chlorine ions in the exhaust), and absence of pure oxygen (which promotes corrosion), all of which apply here;

iv.  Risk analysis of the likelihood of corrosion is also especially important when the ability of the user to predict and detect this failure is low, which applies here because of the innovative and hidden nature of the design of the dry exhaust chambers in the First Generation Outboards;

v.  Risk analysis of the possibility of corrosion is also especially important when the severity of the impact is great, which applies here because the design of the dry exhaust system in the First Generation Outboards uses a manifold separated from the oil pan by just the wall of the manifold, and a muffler separated from the surrounding cooling water jacket just by the wall of the muffler, meaning that if these walls are breached there is an extraordinarily high risk of engine failure; and

vi.  Even after the risk analysis, which should have made the problem readily apparent to any competent engineer, accelerated corrosion tests are routinely conducted for different environments and

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

thermal cycles, including the mimicking of longer term use of the engines over a shorter, more intensive testing cycle.

vii.   Properly conducted, these cyclical tests, which Yamaha at least now claims to perform, would have made the Defect plain.

184.   Thus, Yamaha knew or by the exercise of reasonable care should have known and had reason to know of the Dry Exhaust Defect before it manufactured a single engine for sale.   Properly conducted tests would have discovered the extreme corrosive effects of the combination of the high exhaust gas and chamber temperatures (exacerbated by the shorter exhaust system in the First Generation Outboards), the exposure to salt water exhaust vapor, the presence of corrosive exhaust gas ions, and the absence of oxygen in the dry exhaust chamber.

### *Early Consumer Complaints Show Presale Knowledge*

185.   At least by 2001, Yamaha began to receive calls regarding dry exhaust corrosion in its First Generation Outboards.   In some instances, the dry exhaust corrosion issues were arising with the engines in as little as six months after purchase.

186.   From 2001 onward, the complaints from owners regarding the dry exhaust corrosion in the First Generation Outboards were so frequent that individual Customer Relations supervisors personally handled as many as 40 or 50 different consumer complaints, or more, regarding the issue.   This was an unusual volume of customer complaints regarding corrosion for one of Yamaha's product lines, especially this soon in the life of the engines.

187.   The complaints from owners regarding the dry exhaust corrosion in the First Generation Outboards were so frequent that in 2001, Yamaha executives aware of the problem created a marine-only customer relations service department

in Kennesaw, Georgia, with approximately **two dozen** customer service employees to assist in handling the complaints. The Kennesaw Marine Division generated electronic email communications about corrosion issues in First Generation Outboards in order to inform managers and executives at Yamaha's home offices in Cypress, California, about the nature and extent of the customers' complaints.

188. Oversight of this Kennesaw Marine Division of Yamaha's customer service department was handled by Lindsey Foster, the Manager of Customer Relations for Yamaha based in its Cypress offices. Other members of Yamaha's management in its Cypress home offices, although not directly part of the "discussion team," were still aware of the dry exhaust issues and customer complaints being experienced by the company with its rollout of the First Generation Outboards.

189. The consumer complaints regarding the First Generation Outboards were regularly stored by electronic means in Yamaha's computer records and reviewed by Yamaha's executives. In the late 1990s or early 2000s, Yamaha created a brand new Customer Relations Management ("CRM") database. Each call with a customer was logged into the CRM on a form with space for customer information and model information. The reason for the call would be recorded by special code.

190. The CRM database was searchable by Primary ID number specific to each Yamaha product. The database was also searchable by entry of search terms such as "corrosion." The CRM included the calls concerning corrosion in First Generation Outboards. Executives at YMUS, including Ms. Foster, regularly reviewed reports regarding the content of calls in the CRM.

191. Additionally, Yamaha heard feedback from its customers regarding corrosion difficulties that arose during this time period, from its own initiative in

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

reaching out to its customers through market surveys.  Yamaha conducts periodic market monitoring surveys in order to collect evaluations from actual users.

192.   Despite knowledge of these early consumer complaints from at least 2001 onward, Yamaha did nothing to rectify the issue and everything to bury it. Yamaha did not recall the Class Motors to repair the Dry Exhaust Defect, did not issue any technical service bulletins, did not honor warranty claims in good faith and did not offer to reimburse customers who incurred out of pocket expenses to repair the defect, and falsely shifted the blame to consumers.   Yamaha's knowledge of early consumer complaints in 2001 preceded the purchases of Plaintiffs and many of the Class members.  All of the named Plaintiffs purchased in 2003 or later.

*__Early Repairs, Replacement Orders and Warranty Claims Show Presale Knowledge__*

193.   The frequent customer service calls from irate customers was just a part of the story, as Yamaha's customer service employees also fielded numerous calls, beginning in 2001 and continuing thereafter, from Yamaha's authorized dealers notifying Yamaha of the issue and stating that this kind of corrosion was not normal and should not be occurring.

194.   Yamaha's authorized dealers complained to Yamaha that the corroded parts were rotted out beyond repair and needed to be replaced entirely.

195.   Customer service supervisors in the Kennesaw Marine Division who fielded the calls starting at least by 2001, then reported these voluminous complaints to representatives of Yamaha's executive leadership based in Cypress, including Ms. Foster.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

196.   During this same time period, Yamaha received many warranty claims arising out of the Dry Exhaust Defect, pursuant to Yamaha's contractual guarantee that the motors would be free from defects.

197.   However, rather than owning up that the problem was the result of a design defect, Yamaha instituted a policy to **deny** all timely warranty claims on the grounds that the cause of the dry exhaust corrosion was "improper maintenance."  Yamaha trained and instructed both its customer service and field technical personnel to lay blame on the owners for the engine failure it knew resulted from its own faulty design.

198.   Further, despite early knowledge of these repair requests, replacement orders and corrosion-related warranty claims in 2001 and onward, Yamaha did not recall the Class Motors to repair the Dry Exhaust Defect, did not even a technical service bulletin and did not offer to reimburse customers who incurred out of pocket expenses to repair the defect.  Yamaha's knowledge of these early repair requests, replacement orders and corrosion-related warranty claims from 2001 onward preceded the purchases of Plaintiffs and many of the Class members.  All of the named Plaintiffs purchased in 2003 or later.

### *The Circumstances Regarding the Development of the Second Generation Shows Presale Knowledge*

199.   In 2001, as a result of the customer complaints and the customer service calls fielded by Yamaha from its own authorized dealers that demanded answers for how to handle the widespread problem, Yamaha responded by sending service call requests to Yamaha's service division to have technicians inspect motors that had suffered the dry exhaust corrosion and gather information from the field about the extent of the problem.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

200.   Meanwhile, relatively quickly after that, and by 2002 at the latest, Yamaha's parent company, the manufacturer of the engines, armed with information shared by Yamaha about the volume of early customer service calls, called for a series of tests on first-generation products. Engineering test facilities maintained and operated by the Japanese parent manufacturer first in Fort Pierce, Florida, and later in Bridgeport, Alabama conducted the testing.

201.   Based on the customer service reports regarding the corrosion issue, Yamaha and its parent company worked quickly to develop and sell a dry exhaust "kit" of replacement parts to make repairs possible instead of recalling the defective products.

202.   In or around 2002, Yamaha notified its dealers (but not its customers) that a "kit" of the dry exhaust system replacement parts was available.  At first, the "kit" cost afflicted Yamaha owners thousands of dollars, but eventually Yamaha lowered its asking price to around $800, a purported "discount."  The standard kit contained a Cylinder Gasket, Cover (Pressure Control Valve), Exhaust Guide, Upper Casing Gasket, Exhaust Manifold, Oil Strainer, Oil Pan Gasket, Oil Pan, Exhaust Manifold Gasket, Exhaust Manifold, Muffler, various seals and several Dowel Pins. The Kennesaw Marine Division spearheaded the release of the kit.

203.   The "kit" manufactured by Yamaha's parent company and sold and marketed by Yamaha was reinforced with improved corrosion-resistant coatings. While the First Generation Outboards' dry exhaust parts contained only a primer paint coating that provided little protection from corrosion, the "kit" parts contained two additional layers of protection: an anodizing oxide layer and a chromic layer.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

44

204.   One affected owner went online to describe new replacement parts he had seen.  He described as having on it "a coating like a frying pan . . . that the old one never had."[4]   Another online comment from an owner who was sent replacement exhaust manifold parts identified a new coating which appeared on the replacement parts, which was described as appearing "on all the surfaces (internal and external)" and that it was "similar to Teflon."[5]

205.   Yamaha never admitted, however, that the "kit" parts were new and improved, because doing so would have been an admission regarding the Dry Exhaust Defect.  Yamaha was very careful never to admit fault when it came to the Dry Exhaust Defect, even though as the subject matter came up internally, Yamaha and its representatives were aware and discussed their knowledge with one another, including the fact that Yamaha manufacturing concerns tested and developed the replacement kit parts for delivery to owners and repair centers by 2002 at the latest.  In short, at Yamaha, it was common knowledge internally that the First Generation Outboards were defective.

206.   Thus, although consumers readily made these observations about the Teflon-like coating on kit parts, Yamaha kept quiet.  For example, when Plaintiff Oetegenn's retained marine surveyor contacted Yamaha's customer technical line to ask what changes were made to the exhaust system materials in the parts including in the replacement kit, Yamaha's representatives did not divulge the information.

---

[4] *See* http://www.thehulltruth.com/boating-forum/280320-yamaha-f225-corrosion-teardown-old-thread.html (last checked February 1, 2015).

[5] *See* http://www.thehulltruth.com/boating-forum/296515-f225-teardown-exhaust-corrosion-repair-3.html (last checked February 1, 2015).

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

207.  Instead, Yamaha specifically instructed its field service representatives that customers should be told nothing more than to "buy the repair kit and everything will be OK."

208.  The replacement "kit," of course, was only a part of the necessary response from Yamaha and its parent manufacturer.  Yamaha still stood to profit from huge consumer demand for a four-stroke engine of over 200 horsepower, but it knew that it needed to address the design problems in the First Generation Outboards and develop, market and sell engines that did not suffer the same design flaws.

209.  Accordingly, using the information gathered from the American engineering staff primarily in Bridgeport, Yamaha and its manufacturer parent company began to develop Second Generation four-stroke outboard models with a revamped dry exhaust system, including the same new corrosion-resistant coatings that were contained in the "kit" dry exhaust components, but also other design changes.

210.  Yamaha worked to make specific new design changes in the Second Generation motors with the express goal of preventing development of corrosion in the dry exhaust.  All of these changes were developed between Yamaha's first knowledge of the problem as detailed herein, and their implementation date of 2005 marking the introduction of the Second Generation of four stroke high powered outboards:

      i.  Yamaha added a rubber gasket in between the oil pan and the exhaust manifold in an attempt to provide protection to help that engine oil would not breach the dry exhaust and cause engine failure;

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

46

      ii.  Yamaha more than doubled the number of sacrificial anodes (made of zinc or other more corrosive material than aluminum) in the outboards, raising the number of anodes from six (in First Generation models) to sixteen (in Second Generation models). Sacrificial anodes are present to guard against the development of corrosion to aluminum parts;

     iii.  Yamaha placed the sacrificial anodes for the first time in the dry exhaust parts themselves, and for the first time added them to the cooling lines that go over the dry exhaust passages, anticipating the presence of water and the impact of corrosion in the dry exhaust system;

     iv.  Yamaha changed the anode inspection recommendations from 200 hours in First Generation models to 50 hours or three months in the Second Generation models, as an extra measure against undetected corrosion in the dry exhaust system.

     v.  Yamaha also for the first time recommended inspection of the dry exhaust system itself, specifically, recommending the inspection of the exhaust guide and exhaust manifold after the engine has been used for 1000 hours.

211. The fact that the Second Generation was in the works did not stop Yamaha and its parent company from continuing to manufacture and sell First Generation Outboards. In 2002, the corrosion problem (which typically took 500 to 700 engine hours to manifest) had surfaced first primarily among heavy users who used their engines much more than typical recreational boat owners' usage.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

47

Thus, the buying public was still uninformed about the material fact that the First Generation Four Stroke design contained a hidden defect.

212. The Second Generation models were introduced by Yamaha beginning with the 2005 model year. Yamaha immediately began to market and sell them to its nationwide network of authorized Yamaha dealers. The changes in design to the Second Generation four stroke outboard motors, including the extra anti-corrosive coatings, apparently corrected the Dry Exhaust Defect, as customer complaints waned. Meanwhile, as detailed above, the First Generation Outboards continued to be sold by the dealers in the retail marketplace as model year leftovers.

213. Because the parent manufacturer knew of the defect, including but not limited to what it should have gathered in competent initial design and testing as well as the information it gathered from its engineering test facilities in Florida and Alabama, it had a duty to inform its wholly-owned subsidiary of the full extent of its knowledge. YMUS is the exclusive United States distributor for Yamaha Motor Co. outboard products, including the First Generation Outboards, and thus was responsible for communicating with the public and distributors about the products. In these circumstances, information about a defect that the parent knew is imputed to the subsidiary. In these circumstances, Yamaha is further deemed to know what it would have known if it had exercised due care to ascertain the truth.

214. The Second Generation models were so successful in preventing the corrosion issue from resurfacing that Yamaha and its parent company to this date continue to develop, manufacture, market and sell products that contain the same design improvements and the same new protective coatings to the dry exhaust aluminum. Yamaha's website currently advertises that Yamaha four stroke

motors' "exclusive Phaze Five electro-deposited, anti-corrosive paint process provides an extra-tough barrier against corrosion."[6] More specifically, the paint process for exhaust system parts currently uses an anodic oxide coating, a chemical conversion coating, and lastly, a primer coating.[7]  The anodic oxide coating, according to Yamaha, "adds additional corrosion resistance."  The additional chemical conversion coating, Yamaha explains, "has a high level of corrosion resistance."

215.  Tellingly, Yamaha's current literature as detailed above touts corrosion protection resulting specifically from the anodic oxide coating and the chemical conversion coating.[8]  These were *precisely the layers that were missing* from the First Generation Outboards' dry exhaust components, either on the inside wall or the outside wall of the parts.  The First Generation Outboards contained only the primer paint coating, which provided little protection and which Yamaha's current literature boasts no protective qualities.

216.  In short, the development and introduction of Second Generation four-stroke outboard models with new design features and with corrosion-resistant coatings in the dry exhaust is an admission by Yamaha that the First Generation Outboards were defective in design.  Moreover, it shows that Yamaha knew about the defect in the time it took to research, test and introduce the change in design,

---

[6]  *See*  http://yamahaoutboards.com/outboards/Inline-4/benefits  (last checked February 1, 2015);  *see also*  http://yamahaoutboards.com/outboards/V6-3_3L/features  (indicating use of five step anti-corrosion paint process) (last checked February 1, 2015).

[7]  *See*  http://global.yamaha-motor.com/business/outboards/corrosion-resistance/ (last checked February 1, 2015).

[8]  *See again*  http://global.yamaha-motor.com/business/outboards/corrosion-resistance/ (last checked February 1, 2015).

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

which given the introduction of the "kit" parts in 2002 (and the testing on the kit that came before its release), preceded the purchases of Plaintiffs and many of the Class members.  All of the named Plaintiffs purchased in 2003 or later.

### *Early Active Concealment Shows Presale Knowledge*

217.   While developing the Second Generation models to eliminate the Defect, and which did in fact eliminate consumers' problems, instead of making things right with the purchasers of First Generation Outboards who were suffering engine failures and incurring substantial repair and replacement costs to keep their engines operable through their reasonably expected useful life, Yamaha blamed the owners for the problem and took no responsibility.

218.   The blame placed on owners is evidenced by what Yamaha's representatives told a number of the Plaintiffs, other members of the Class, and other investigators looking into the corrosion difficulties in First Generation Outboards, over a long time frame and dating back into the pre-sale period.

219.   After Plaintiff Blatt's motor overheated and was repaired in 2009, he spoke to a Yamaha representative and was told that improper flushing was the cause of his problem.  He asked Yamaha's representative why flushing would make a difference since the corrosion began on the dry exhaust side, but the representative had no response.

220.   Plaintiff Overman was told by Yamaha's representatives after her 2011 engine failure that the blow up of her motor happened due to the dry exhaust corrosion but that the corrosion problem was her fault because she must not have flushed the engine after every use.  In reality, Overman had flushed her motor after every use but to no effect.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

221.   An iBoats forums user named "MaurFishin" posted on July 4, 2005, that Yamaha had explained to him that his dry exhaust corrosion problem was "due to lack of maintenance."[9]

222.   Moreover, as reported in the BoatUS Article, Yamaha's representatives told investigators at BoatUS in 2012 that "the best way to prevent the issues encountered is to flush the motor after every use."   BoatUS investigators were not satisfied with this explanation, for as explained in the article they made "repeated requests" to get Yamaha to explain how flushing the engine would prevent corrosion of dry exhaust parts, where water does not flow. However, as the BoatUS article states, "Yamaha would not provide further clarification."

223.   The consistent "party line" from Yamaha to blame the owners and brush off complaints by consumers and their boat mechanics, dates well back into the pre-sale period, showing active concealment during those years also.   As detailed earlier, Yamaha received warranty claims beginning around 2001 based on the Dry Exhaust Defect, but denied them on grounds that the cause of the dry exhaust corrosion was "improper maintenance."   The Yamaha customers that tried to hold Yamaha to its warranty obligations were angered by the denial – because they had properly maintained their motors and the failure of the engines was not in any respect due to any mistake or lack of diligence on their part.

224.   Moreover, no later than 2002, customer service supervisors were expressly told by representatives from Yamaha's executive leadership in Cypress, California, that customers were to be informed that the dry exhaust corrosion

---

[9]   See,   http://forums.iboats.com/forum/engine-repair-and-maintenance/yamaha-suzuki-outboards/147086-yamaha-f225-exhaust-passage-corrosion-root-cause (last checked February 1, 2015). *Id.*

problems were occurring because of a lack of proper maintenance, including inadequate fresh water flushing.

225.   The reality is that fresh water flushing procedures would have had no effect at all on the corrosion buildup. As reported in the BoatUS Magazine article, a marine surveyor in Massachusetts who inspected three ruined First Generation Outboards determined that improper flushing, if it had occurred, would not have made a difference since the corrosion was on the dry side where no cooling water was present.  The surveyor told BoatUS that there was ***nothing an owner could have done to prevent serious corrosion from eventually eating through the exhaust system.***

226.   As Yamaha would know, during all relevant times dating back to the roll out of the First Generation Outboards in 2000, in its capacity as the exclusive seller of these engines in the United States and the author of the owners' and service manuals for the outboards, the "dry" exhaust system is never flushed.

227.   The fact that flushing has no bearing at all on the corrosion caused by the Dry Exhaust Defect is further supported by Plaintiffs' experiences in that they all reported flushing in accordance with Yamaha recommendations. Further, BoatUS reported that its members also flushed engines regularly as recommended. Yet all of these owners suffered the same problem that Yamaha falsely claimed flushing would have prevented.

228.   The fact that the First Generation Outboards represented an innovation for Yamaha provided motivation to avoid publicizing the fact that its exhaust systems were inevitably failing due to rapid onset corrosion.  Yamaha's "blame the owners" strategy was a purposeful diversion from the real issue, the Dry Exhaust Defect.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

229.   Yamaha's knowledge preceded the purchases of Plaintiffs and many of the Class members.  All of the named Plaintiffs purchased in 2003 or later.

## THE DRY EXHAUST DEFECT MANIFESTED DURING A TIME WHEN THE REASONABLE CONSUMER WOULD STILL BE USING THE CLASS MOTORS

230.   Yamaha's failure to recall or give consumers notice about the Dry Exhaust Defect was concealment of material information from the Class. Reasonable consumers expect to, and in fact do, use their expensive outboard engines beyond the expiration of the written warranty.  A recreational boater normally puts less than 100 hours on an engine in an annual boating season, a figured expressly confirmed in the BoatUS Magazine article.[10]  Thus, Yamaha's 3 year warranty only covered approximately 300 or so hours of use.

231.   Outboard engines, if properly used and maintained, can and should last for a long time, much longer than 300 hours, or even the 600 hours that would be covered by the extended warranty. Marine specialists with expertise in corrosion have concluded that, following routine maintenance, typically about 2,000 hours is an appropriate reasonable consumer expectation for useful life for these expensive four stroke outboards before the need for expensive engine overhaul.

---

[10] This figure is largely confirmed by the Named Plaintiffs' Experiences, some of whom used as few as 20, 33.3 and 50 hours per year, as detailed above.  Several other of the Named Plaintiffs used their engines in approximately the 80 hours per year range.  Plaintiff Gilderman, who lives in a tropical climate, used his engines 105.5 hours per year, yet nonetheless still came close to the benchmark figure, and even the heaviest user, Plaintiff DiOrio, used his engines at only an average of 122.2 hours per year.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

232.   A reasonable consumer expects to use well-maintained outboard engines for as many as 2,000 hours before overhaul. The existence of a defect that causes corrosion-related engine failure, overheating or engine smoke outs at the 500 to 700 hour mark and associated safety threats is material information to consumers.[11]

## YAMAHA HAD A DUTY TO DISCLOSE THE DRY EXHAUST DEFECT DUE TO ITS UNREASONABLE SAFETY RISK

233.   Yamaha never issued a recall or a technical service bulletin related to the Dry Exhaust Defect, and actively concealed the Defect by blaming the consumers for improper maintenance, all the while continuing to sell and market First Generation Outboards.

234.   Yamaha had a duty to disclose the Dry Exhaust Defect because its customers faced unreasonable safety risks and the defect was hidden from them by the design and placement of the exhaust system.

### *Risk of an On-Board Fire*

235.   A leak of flammable engine oil which can occur when corroded dry exhaust parts crack or break down is hazardous.  When engine oil enters areas it is not supposed to, particularly the very hot dry exhaust components of the First Generation Outboards, it begins to burn.  When engine oil burns in a dry exhaust chamber, the boat operator is essentially dealing with an on-board fire.

---

[11] Outboards with 500 to 700 hours – which for a typical consumer using the boat 100 hours a year would take five to seven years to achieve – are generally considered to be, and in fact are, low hour engines.  Yamaha dealers have been known to advertise used engines for sale with 500 to 700 hours as "very low" hour engines.  In the marketplace for used outboard engines, engines with only 500 hours on them are repeatedly advertised as low hour engines, and can fetch high prices given their remaining useful life unless a defect is disclosed.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

236. Another risk of an on-board fire comes from the overheating of already hot engines which can occur when corroded dry exhaust parts crack, break down or develop holes. In these instances, water can leak into the dry exhaust from the wet side exhaust which is continually running water around the outside of the dry exhaust area in order to control temperatures. If not enough water is able to run through the wet exhaust, because water is escaping into the dry exhaust, then the First Generation Outboards can overheat.

237. To the extent Plaintiffs' and Class members' engines smoked out or overheated, they faced personal safety risks brought about by the severe corrosion associated with the Dry Exhaust Defect. The examples are numerous.

238. Plaintiff Oetegenn's engine smoked out and began to emit blue smoke during operation. Both the service mechanic at Boating Dynamics, who specialized in Yamaha engines, and the Certified Marine Surveyor who inspected the engines as part of an insurance claim, concluded that the smoke out occurred because corrosion from the dry exhaust system had eaten away a hole allowing oil from the crankcase to be pumped into the exhaust.

239. Plaintiff DiOrio's engine overheated on multiple occasions necessitating that the engine be shut down. Specially trained mechanics at an authorized Yamaha dealer diagnosed that the overheating had occurred because severe corrosion had caused a hole between the dry exhaust and the wet exhaust, allowing enough water to leak through the corrosion hole that there was not enough water circulating through the wet exhaust to keep the engine cool.

240. Plaintiff Blatt's port side motor overheated on repeated occasions. His Yamaha certified mechanic at Southeastern Marine, diagnosed severe corrosion as the cause of the overheating problem and warned Blatt that it was simply a matter of time before his engine failed at sea.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

241.   Plaintiff Overman's First Generation Outboard overheated and also quickly thereafter blew up during operation.   Her Yamaha trained service technicians at her marina identified that corrosion was the culprit as water from the wet exhaust was invading the dry exhaust through a hole.

242.   An online post in a www.iboats.com forum dated July 4, 2005, by a user named "MaurFishin" reported an overheating problem in his twin engines even though externally the engines showed no signs of corrosion. He had the engines service and the service technicians, after removing the power head, discovered corrosion in the dry exhaust areas had caused the problem.[12]

243.   An online post on Florida Sportsman Forums dated October 15, 2012, by user named "Dkivdg" noted that due to the corrosion issue, just past the expiration of his extended YES warranty, his twin engines "started overheating at idle."   Corrosion was held responsible and the poster had $3,500 in repair costs per engine.[13]

244.   A forum post on the Stripers Online website dated March 3, 2012 by a user named "grady33" noted that after only about 500 hours of use, his First Generation Four Stroke Outboard "started blowing smoke," and the dealership found dry side exhaust corrosion to be responsible.[14]

---

[12] See   http://forums.iboats.com/forum/engine-repair-and-maintenance/yamaha-suzuki-outboards/147086-yamaha-f225-exhaust-passage-corrosion-root-cause (last checked February 1, 2015).

[13]   See   http://forums.floridasportsman.com/archive/index.php/t-75927.html   (last checked February 1, 2015).

[14] See http://www.stripersonline.com/t/557820/yamaha-225-four-stroke-corrosion-problems/60 (last checked February 1, 2015).

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

### *Risk of a Boat Accident and Associated Casualties, or Other On-Board Injuries*

245.   Loss of engine power during operation is not just a matter of long term immobilization of the boat or inability to restart the engine. Yamaha itself has acknowledged and admitted in its owners' manuals for the First Generation Outboards that the loss of engine power during operation means "the ***loss of most steering control***," and that this is a safety issue. The Class Motors are attached to a swivel mount that allows the driver to change direction. When the engine fails, the boat cannot be controlled. If the boat cannot be controlled, the possibility of having an accident is greatly enhanced. With engine failure and associated loss of steering, the boat occupants are at the mercy of the wind, currents and waves, thus increasing the likelihood of a collision with another boat, objects in the water, or being pushed uncontrollably onto land or rocks. Yamaha itself identified this risk in a warning in the owners' manuals to avoid engine failure. *See* ¶ 8, *supra.*

246.   Yamaha itself acknowledges the tangible risk of casualties which comes with loss of engine power during operation in its owners' manuals for the First Generation Outboards that state that loss of engine power "***means the loss of steering control***", and that "without engine power, the boat could slow rapidly. ***This could cause people and objects in the boat to be thrown forward.***"  This "WARNING" instruction is explained by Yamaha elsewhere in the manual as one that if not followed, could result in "severe injury of death" of the operator or an innocent bystander.   Further, the warning is accompanied by a Safety Alert Symbol that elsewhere in the manual is indicated to symbolize "ATTENTION! BECOME ALERT!  YOUR SAFETY IS INVOLVED!" *See* ¶ 8, *supra.*

### ***Causal Nexus Between the Corrosion and Engine Failure***

247.   There is a causal nexus between the corrosion to the internal component parts in the Class Motors and engine failure. Corrosion to the engine oil pan and exhaust manifold, without correction, ultimately lead to inevitable sudden engine failure, or overheating or oil leaking that presages inevitable engine failure if unnoticed.

248.   Yamaha's owner's manuals for the First Generation Outboards expressly acknowledge that corrosion can damage engine parts.  The 2004 Yamaha F200C/FL200C/F225C/LF225C Owner's Manual, U.S.A. Edition  states at 3-16 that corrosion may damage power trim and tilt mechanism, at 4-7 that anti-corrosion measures are recommended in form of washing down exterior and spraying with silicone protectant, and at 4-25 thatuse of corrosion-resistant grease is recommended. The owner's manuals are silent about the Dry Exhaust Defect, however.

249.   The Boat Owners Association of the United States warns that galvanic corrosion and stray current corrosion can harm the engine motors used on boats.[15]

250.   Peer-reviewed articles in engineering and technology publications have provided an applied mechanics analysis to shed insight as to why an internal combustion engine may fail due to the corrosion of internal parts.[16]

251.   General overviews on why metals fail, including corrosion cracking, have been made publically available by a variety of different sources ranging from

---

[15] See http://www.boatus.com/boattech/articles/marine-corrosion.asp (last checked on February 1, 2015).

[16] See e.g. http://www.ijirset.com/upload/december/7-Failure%20Analysis%20of%20Internal.pdf  (last checked on February 1, 2015).

researchers in Materials Science and Engineering at SUNY Stony Brook to private equipment design firms.[17]

252.   The causal nexus between corrosion and engine failure is supported by Plaintiffs' experiences and the examination of the reasons for their engine failures by servicing specialists with Yamaha's required training background and experience in repair and service of Yamaha outboards. For example, Plaintiff Overman's engine failed and blew up during use.  Her Yamaha-trained technician identified the cause as a breach in the wall between the dry exhaust and the wet exhaust due to corrosion to internal dry side exhaust components including the dry exhaust housing and a "rotten" exhaust tuner.

253.   Ramos' and Jacks' Yamaha-trained technician inspected their engine that had lost power and told them that the failure had been caused by a hole caused by severe corrosion, and specifically that the "cylinder head and engine block corroded away."

254.   Plaintiff Blatt's Yamaha certified mechanic informed him that it was "just a matter of time" before the severe corrosion in his already overheating engine would cause it to fail, once water began to mix together with the engine oil.

255.   Plaintiff DiOrio's effectively suffered engine failure because the motor could not be run safely without overheating and he had to repeatedly shut it down at sea to let it cool.  The mechanic, who had seen a number of prematurely corroded First Generation Outboards, concluded that the issue was that corrosion had caused a hole to develop between the dry exhaust and the wet exhaust.

---

[17] See e.g. http://www.lsptechnologies.com/metal-failure-types.php (last checked on February 1, 2015) and http://www.matscieng.sunysb.edu/disaster/fail-anal/ (last checked on February 1, 2015).

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

256.  Plaintiff Markowitz's experience provides two examples of this causal connection.  First, Markowitz suffered engine failure at sea on one of his twin First Generation Outboards at about the 350 hour mark.  A very experienced Yamaha trained mechanic determined that it had failed due to corrosion in the dry exhaust, specifically, seawater that had infiltrated the oil pan through holes eaten away due to corrosion.  Second, at about the 430 hour mark, his second engine failed also and it was later found that the same dry exhaust corrosion issue was to blame.

### *Causal Nexus Between Engine Failure and Risk of Boat Accident*

257.  The American Boating Association ("ABA"), in materials presented in the interest of boater safety, has made advisory statements that support a causal nexus between machinery failure and boating accidents.  The ABA has concluded based on available public data that machinery failure ranks in the top five primary contributing factors in boating accidents.[18]

258.  The annual reports on Recreational Boating Statistics published by the United States Coast Guard also support a causal nexus between machinery failures on the one hand and boat accidents on the other.  In the Coast Guard's 2013 report, in one year alone and in the United States alone, there were a total of 286 accidents caused by machinery failure.  In its 2012 report, the Coast Guard reported 346 accidents caused by machinery failure.  The Coast Guard has published results annually for more than 50 years, and each of its reports consistently support a causal link between machinery failures and accidents.

259.  There is a causal nexus between boat accidents that occur as the result of machinery failure and human casualties.  In the Coast Guard report for

---

[18] See http://www.americanboating.org/boating_fatality.asp (last checked February 1, 2015).

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

2013, machinery failure related accidents resulted in 9 deaths and 81injuries, including 3 deaths as the result of steering system failure, 2 deaths as the result of exhaust system failure and 4 deaths as the result of engine failure.  In the report for 2012, machinery failure related accidents resulted in 10 deaths and 115 injuries, including 4 deaths as the result of steering system failure and 5 deaths as the result of engine failure. The actual numbers are likely even higher as these figures include only accidents reported to the Coast Guard in accordance with Coast Guard regulations and by no means all boating accidents.

260.  In addition, the Florida Fish & Wildlife Conservation Commission's 2012 publication on boating accident statistics supports a finding of a causal nexus between machinery failure and boating accidents, of which it reports that 44% are collisions with other boats or with fixed objects.  The Commission concluded that the primary accident causes in the State of Florida were "carelessness and machinery failure," factoring as the leading causes in 164 accidents in Florida in 2012 alone.

261.  Also, the safety and accident risk brought about by engine failure on a boat, including in particular steering failure, has led the NASA Ames Research Center to develop detailed guidelines for federal emergency response and recovery teams to recognize causes, potential effects and measures for mitigation.[19]

262.  Lastly, the causal nexus between Plaintiffs' personal engine failures and the safety risk they faced is factually supported by Plaintiffs' own experiences:

---

[19]   See   http://dart.arc.nasa.gov/Water/files/Boat%20Mechanical%20Problems%20-%20Equipment%20Failure%20or%20Damage.pdf   (last checked February 1, 2015).

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

i.  Overman lost steering control of her boat.  She reported that when the engine power was lost, the "rudder and steering . . . that all stopped."

ii.  DiOrio, who was forced to stop his engine to get it to cool down, was left immobilized in the heavy traffic of his preferred fishing locale near the coast of Rhode Island. Although DiOrio is an experienced seaman, being immobilized and vulnerable in heavy traffic was a significant safety concern to him due to the particularized traffic pattern and behaviors of other boaters who used the same area.

iii.  Ramos and Jacks could not steer their boat.  When the engine lost power, the ability to control the boat was lost.

## CLASS ALLEGATIONS

263.  Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

264.  Plaintiffs bring this action on their own behalf and on behalf of a Class and/or Subclasses under Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

265.  The Class is defined as:

All individuals residing in the United States who purchased one or more of the Class Motors for personal use, and not for resale.

266.  The Class includes the following Subclasses, which are defined as:

All California residents who purchased one or more of the Class Motors for personal use, and not for resale (the "California Subclass").

All Massachusetts residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Massachusetts Subclass").

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

All New York residents who purchased one or more of the Class Motors for personal use, and not for resale (the "New York Subclass").

All North Carolina residents who purchased one or more of the Class Motors for personal use, and not for resale (the "North Carolina Subclass").

All Washington residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Washington Subclass").

All Florida residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Florida Subclass").

All Texas residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Texas Subclass").

All Rhode Island residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Rhode Island Subclass").

All Virginia residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Virginia Subclass").

All Maryland residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Maryland Subclass").

All New Jersey residents who purchased one or more of the Class Motors for personal use, and not for resale (the "New Jersey Subclass").

All Connecticut residents who purchased one or more of the Class Motors for personal use, and not for resale (the "Connecticut Subclass").

267.   Excluded from the Class are individuals who have claims for personal injury resulting from failure of Yamaha outboard motors.

268.   Also excluded from the Class are Yamaha; any affiliate, parent, or subsidiary of Yamaha; any entity in which Yamaha has a controlling interest; any officer, director, or employee of Yamaha; any successor or assign of Yamaha; any Judge to whom this case is assigned as well as his or her immediate family and staff.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

269.  Plaintiffs reserve the right to amend or modify the Class definitions in connection with a motion for class certification or as warranted by discovery.

270.  This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Federal Rule of Civil Procedure 23.

271.  <u>Numerosity</u>:  Plaintiffs do not know the exact size or identities of the proposed Class, however, Plaintiffs are informed and believe that the Class encompasses many thousands or tens of thousands of individuals who are dispersed geographically throughout the United States.

272. Thus,  the  proposed  Class  is  so  numerous  that joinder of all members is impracticable.  Class members may be notified of the pendency of this action by mail and/or electronic mail, supplemented if deemed necessary or appropriate by the Court by published notice.

273.  <u>Existence and Predominance of Common Questions of Fact and Law</u>: There  are  questions  of  law  and  fact  that  are  common  to  the  Class,  and predominate over any questions affecting only individual members of the Class. The damages sustained by Plaintiffs and the other members of the Class flow from the common nucleus of operative facts surrounding Yamaha's misconduct.  The common questions include, but are not limited to the following:

     a.   whether the dry exhaust system in the Class Motors contains the Dry Exhaust Defect;

     b.   whether Plaintiffs and the Class member's outboard motors have a lower market value as a result of the Dry Exhaust Defect;

     c.   whether Yamaha knew or should have known of the Dry Exhaust Defect;

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

d.   whether the existence of the Dry Exhaust Defect constitutes a material fact to purchasers of the First Generation Outboards;

e.   whether Yamaha had a duty to disclose the Dry Exhaust Defect;

f.   whether the Dry Exhaust Defect led to premature onset of corrosion in the First Generation Outboards;

g.   whether the Dry Exhaust Defect led to engine failure or other safety risks;

h.   whether Yamaha has engaged in unlawful, unfair or fraudulent business practices;

i.   whether Yamaha has engaged in unfair or deceptive acts or practices;

j.   whether Plaintiffs and the other Class members are entitled to equitable relief, including but not limited to restitution or injunctive relief; and,

k.   whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

l.   whether at the time Yamaha became aware of the Dry Exhaust Defect it had a continuing duty to notify Class members.

274.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class purchased First Generation Outboards with the same defective design.

275.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent the interests of the Class.  They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and are experienced in class action litigation.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

276. <u>Superiority</u>:  A class action is superior to other methods for the fair and efficient adjudication of this controversy.  While substantial, the damages suffered by each individual Class member do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Yamaha's conduct.  Further, it would be virtually impossible for the members of the Class to individually and effectively redress the wrongs done to them.  A class action regarding the issues in this case does not create any problems of manageability.  The class action device presents far fewer management difficulties than alternative methods of adjudication, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

277. In the alternative, the Class may be certified because:

    i.  the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Yamaha;

    ii.  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudications, or substantially impair or impede the ability to protect their interests; and

    iii.  Yamaha has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

# COUNT I

## VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### California Civil Code § 1750, et seq.
#### (On Behalf of Named Plaintiffs and the Class; Alternatively, on Behalf of Plaintiffs Oetegenn, Ramos, Jacks and Camilleri and the California Subclass)

278.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

279.   Yamaha engaged in unfair competition or unfair or deceptive acts or practices in violation of the CLRA when Yamaha failed to disclose and/or concealed material facts from Plaintiffs and the other members of the Class regarding the Dry Exhaust Defect, including and the attendant risks of engine failure and corresponding safety risks with use after the expiration of the warranty period.

280.   The information Yamaha failed to disclose was material.   Had Yamaha disclosed the Dry Exhaust Defect, consumers would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

281.   Named Plaintiffs and members of the Class, regardless of their state of residence, were harmed by Yamaha's aforementioned unlawful business acts and practices occurring in and emanating from the State of California.

282.   Pursuant to §1782 of the Act, Plaintiffs  by and through their counsel notified Yamaha in writing by certified mail of the particular violations of §1770 of the Act and demanded that Yamaha rectify the problems associated with the actions detailed above and give notice to all affected consumers of Yamaha's intent to so act.  A copy of the letter is attached hereto as Exhibit A.  Yamaha did not respond to the letter.  In addition, Yamaha was on notice of the Dry Exhaust Defect from complaints and service requests received from Plaintiffs and other

members of the Class, as well as through its own internal investigations as reported in the BoatUS article.

283.   Yamaha failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice.

284.   Yamaha's conduct is fraudulent, wanton and malicious.

285.   Accordingly, pursuant to Cal. Civ. Code §1782(a), Named Plaintiffs and the Class (and in the alternative Plaintiffs Oetegenn, Ramos, Jacks and Camilleri and the California Subclass) seek in this Consolidated Complaint, in addition to equitable relief, actual, statutory and punitive damages as permitted under the CLRA and applicable law.

## **COUNT II**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §17200, et seq.**
**(On Behalf of Named Plaintiffs and the Class; Alternatively, on Behalf of Plaintiffs Oetegenn, Ramos, Jacks, Camilleri and the California Subclass)**

286.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

287.   Yamaha's business acts and practices complained of were centered in, carried out, effectuated and perfected within the State of California and emanated therefrom throughout the United States, injuring all Class members.

288.   Plaintiffs and all members of the Class, regardless of their state of residence, were harmed by Yamaha's aforementioned unlawful, unfair or fraudulent business acts and practices occurring in the State of California.

289.   Beginning in at least 2000, Yamaha committed acts of unfair competition, as defined by California Business and Professions Code, §§17200, et seq., by engaging in the acts and practices specified above.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

290.   This claim is instituted on behalf of Named Plaintiffs and the Class, and alternatively on behalf of Plaintiffs Oetegenn, Ramos, Jacks, Camilleri and the California Subclass, to obtain equitable monetary and injunctive relief from Yamaha for acts and practices, as alleged herein, that violated §17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

291.   Yamaha engaged in "unlawful" business acts and practices by violating the Consumer Legal Remedies Act, Cal. Civ. Code §§1750, et seq., and by breaching express and implied warranties.

292.   Yamaha engaged in "unfair" business acts and practices by marketing and selling First Generation Outboards knowing that they contained the Dry Exhaust Defect, but without disclosing this material information.  The harm to consumers is outweighed by pro-competitive justifications for Yamaha's conduct, if any.  These acts are deceptive business practices.

293.   Additionally, the acts and practices of Yamaha have caused Named Plaintiffs and the Class members to lose money or property by being overcharged for and paying for the defective outboard motors at issue.  Indeed, these Plaintiffs and Class members paid inflated prices for Yamaha's products and were subjected to unreasonable safety risks that they would not have undertaken had they known the truth.

294.   Such loss was the result of the above acts of unfair competition and Yamaha's misconduct in violation of the laws set forth above.

295.   Yamaha has been unjustly benefitted as a result of its wrongful conduct and its acts of unfair competition.  Plaintiffs and the Class members, and in the alternative, Plaintiffs Oetegenn, Ramos, Jacks, Camilleri and the California Subclass, are accordingly entitled to equitable relief including restitution and/or

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

disgorgement of all revenues and profits that may have been obtained by Yamaha as a result of such business acts and practices, pursuant to California Business and Professions Code §§17203 and 17204.

## COUNT III

### VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT
**(On behalf of Plaintiff Pencinger and the Massachusetts Subclass only)**

296.   Plaintiff Pencinger repeats and re-alleges every allegation above as if set forth herein in full.  Yamaha's conduct as alleged herein caused substantial injury to consumers and constitutes unfair and deceptive acts or practices in the conduct of trade and commerce under the Massachusetts Consumer Protection Act, Massachusetts General Laws Annotated, Chapter 93A, Section 2 (the "Act").

297.  Yamaha's conduct as alleged herein caused Pencinger and the Massachusetts Subclass to act differently than they would have otherwise acted. Absent Yamaha's conduct, Pencinger and the members of the Massachusetts Subclass would either have not purchased the outboard motors in question, or would have insisted on paying less for them.

298.   Yamaha's conduct caused Pencinger and the Massachusetts Subclass loss of money or property.  Indeed, these Plaintiffs and Class members paid inflated prices for Yamaha's products and were subjected to unreasonable safety risks that they would not have undertaken had they known the truth.

299.   Yamaha used or employed an unfair or deceptive act or practice declared unlawful by section two of the Act, or by a rule or regulation issued under the Act.   Specifically, Yamaha's conduct fails to comply with the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), or with the existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any

political subdivision thereof intended to provide the consumers of the Commonwealth of Massachusetts protection.

300.   Yamaha violated state and federal laws within the meaning of the Act by failing to adequately disclose material information, and acting with the capacity or tendency or effect of deceiving buyers.

301.   Yamaha's unfair and deceptive acts or practices have been both the but-for cause in fact, as well as the proximate cause of damage, to Pencinger and the Massachusetts Subclass members in an amount to be proven at trial.

302.   As a result of Yamaha's conduct as alleged herein, Pencinger and the members of the Massachusetts Subclass suffered economic and financial injuries, losses and damages. Had Yamaha disclosed the Dry Exhaust Defect, Pencinger and the members of the Massachusetts Subclass would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them. Additionally, they were subjected to unreasonable safety risks that they would not have undertaken had they known the truth.

303.   Pencinger seeks and is entitled to an order enjoining Yamaha from continuing to engage in the unfair and deceptive acts and practices alleged herein.

304.   Yamaha's deceptive acts and practices as alleged herein were willful and knowing.

305.   Pencinger and the members of the Massachusetts Subclass should be awarded actual damages which should be doubled or trebled within the discretion of the Court.

306.   More than thirty (30) days before the filing of this Consolidated Complaint, a written demand for relief was sent by registered mail by Plaintiffs' counsel to Yamaha, describing the unfair or deceptive acts or practices and the injuries suffered by a class of consumers nationwide who purchased First

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

Generation Outboards.   A copy of the letter is attached hereto as Exhibit A. Yamaha completely ignored Plaintiffs' written demand for relief.   In addition, Yamaha was on notice of the defects from complaints and service requests it has received from Plaintiffs and other members of the Class, as well as through its own internal investigations as reported in the BoatUS article.

307.   Pursuant to Mass. Gen. Laws Chapter 93A §9, Pencinger and his counsel will seek reasonable attorneys' fees, to be awarded within the discretion of the Court.

## COUNT IV

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
**(On behalf of Plaintiffs Chiariello, Cooperman and the New York Subclass only)**

308.   Plaintiffs Chiariello and Cooperman repeat and re-allege every allegation above as if set forth herein in full.

309.   Chiariello and Cooperman are residents of the State of New York and purchased their First Generation Outboards in the State of New York.

310.   Yamaha's conduct as alleged herein constitutes deceptive acts and practices in the conduct of a business, trade, or commerce or in the furnishing of a service in the state of New York in violation of N.Y. Gen. Bus. Law §349, et seq.

311.   Yamaha's conduct as alleged herein was directed at consumers such as Chiariello, Cooperman and members of the New York Subclass, was consumer oriented misconduct that was misleading in a material respect to a reasonable consumer acting reasonably under the circumstances, and had a broad impact on consumers at large.

312.   As a direct and proximate result of Yamaha's conduct as alleged herein, consumers such as Chiariello, Cooperman and the members of the New York Subclass suffered actual damages in excess of $50 and including economic and financial losses.   In particular, as a result of Yamaha's deceptive acts, the

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

price paid by Chiariello, Cooperman and New York class members for their First Generation Outboards was inflated.   Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them. Additionally, they were subjected to unreasonable safety risks that they would not have undertaken had they known the truth.

313.   Yamaha's deceptive acts and practices as alleged herein were willful and knowing.

314.   Chiariello, Cooperman and the members of the New York Subclass are entitled to injunctive relief and should be awarded actual damages which should be trebled within the discretion of the Court.

315.   Pursuant to N.Y. Gen. Bus. Law §349(h), Chiariello, Cooperman and his counsel will seek reasonable attorneys' fees, to be awarded within the discretion of the Court.

## COUNT V

**VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(On behalf of Plaintiff Overman and the North Carolina Subclass only)**

316.   Plaintiff Overman repeats and re-alleges every allegation above as if set forth herein in full.

317.   Yamaha's misrepresentations and omissions as alleged herein constitute unfair methods of competition and unfair or deceptive acts or practices affecting commerce and are unlawful under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1, et seq.

318.   Yamaha's actions in question affected commerce in the State of North Carolina.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

319.   Yamaha's conduct has been a proximate cause of damage to Overman and the North Carolina Subclass members in an amount to be proven at trial.

320.   As a result of Yamaha's unfair and/or deceptive business practices, Overman and all members of the North Carolina Subclass overpaid for the products.   Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

321.   By omitting to disclose material facts about the defects in the First Generation Outboards, Yamaha's acts and omissions were immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

322.   Overman and the North Carolina Subclass overpaid and were subject to unreasonable safety risks that they otherwise would not have taken, but for Yamaha's omissions of material facts.

323.   Overman and the North Carolina Subclass seek and are entitled to an order enjoining Yamaha from continuing to engage in the unfair and deceptive business practices alleged herein.

324.   Overman and the North Carolina Subclass seek and are entitled to restoration of moneys paid in respect to the engines.

325.   Overman and members of the North Carolina Subclass should be awarded damages, which should be trebled pursuant to N.C. Gen. Stat. §75-16. Overman and her counsel will seek reasonable attorneys' fees pursuant to N.C. Gen. Stat. §75-16.1.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

# COUNT VI

## VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT
### (On behalf of Plaintiff Williams and the Washington Subclass only)

326.   Plaintiff Williams repeats and re-alleges every allegation above as if set forth herein in full.

327.   Yamaha's conduct as alleged herein constitutes unfair methods of competition and unfair and deceptive acts and practices in the conduct of a trade or commerce and is unlawful pursuant to Wash. Rev. Code §19.86.010, *et seq.*

328.   Yamaha's conduct as alleged herein deceived Plaintiff Williams and the Washington Subclass and had the capacity to deceive a substantial portion of the public such that it impacted the public interest.

329.   Yamaha's unlawful acts and practices proximately caused actual damage to Williams and the Washington Subclass members in an amount to be proven at trial.

330.   As a result of Yamaha's unfair and/or deceptive business practices, Williams and all members of the Washington Subclass have lost money in that they paid inflated prices for Yamaha's products and were subjected to unreasonable safety risks that they would not have undertaken had they known the truth.  Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

331.   Williams and the Washington Subclass seek and are entitled to an order enjoining Yamaha from continuing to engage in the unfair and deceptive business practices alleged herein.

332.   Damages awarded to Plaintiff Williams and members of the Subclass should be trebled pursuant to Wash. Rev. Code. §19.86.090, and include interest pursuant to Wash. Rev. Code §19.86.909.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

333.   Williams and the Washington Subclass are entitled to recover a reasonable sum for the necessary services of Plaintiff's attorneys in preparation and trial of this action pursuant to Wash. Rev. Code §19.86.090.

## COUNT VII

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (On behalf of Plaintiff Gilderman, Washington and the Florida Subclass only)

334.   Plaintiff Gilderman and Washington repeat and re-allege every allegation above as if set forth herein in full.

335.   Yamaha's conduct as alleged herein was likely to mislead consumers acting reasonably in the same circumstances and constitutes unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practice in the conduct of a trade or commerce that are unlawful under Fla. Stat. §501.201, *et seq*.

336.   Yamaha engaged in unfair competition and unfair, unlawful or fraudulent business practices by knowingly and intentionally concealing from Plaintiff Gilderman, Washington and the Florida Subclass members the fact that the First Generation Outboards suffer from a design defect.

337.   As a result, Gilderman, Washington and the Florida Subclass overpaid and were subjected to unreasonable safety risks that they otherwise would not have taken had they known the truth.  Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

338.   These unfair methods of competition and unfair and deceptive acts have caused injuries to Plaintiff Gilderman, Washington and members of the Florida Subclass.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

## <u>COUNT VIII</u>

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
### TEX. BUS. & COM CODE ANN. § 17.12 *et seq.*
### (On Behalf of Plaintiff Markowitz and the Texas Subclass Only)

339.   Plaintiff Markowitz repeats and re-alleges every allegation above as if set forth herein in full.

340.   The Texas Deceptive Trade Practices Act permits a consumer to maintain an action when the consumer has suffered economic damages through "the use or employment by any person of a false, misleading, or deceptive act or practice…" Tex. Bus. & Com. Code Ann. § 1750.

341.   Yamaha has engaged in false, misleading, or deceptive acts or practices by knowingly and intentionally concealing from Plaintiff Markowitz and the Texas Subclass members the fact that the Class Motors suffer from a design defect.

342.   Yamaha's active concealment of this material safety defect constituted a misleading or deceptive act, which would have the capacity to deceive an ordinary person, and did deceive Plaintiff, who relied upon the false, misleading or deceptive acts of Yamaha.

343.   As the result of Yamaha's false, misleading, or deceptive acts or practices, Plaintiff Markowitz and the Texas Subclass overpaid and were subjected to unreasonable safety risks that they otherwise would not have taken had they known the truth. Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

## COUNT IX

### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTECTION ACT
### R.I.G.L § 6-13.1-1 *et seq.*
### (On Behalf of Plaintiff DiOrio and the Rhode Island Subclass Only)

344.   Plaintiff DiOrio repeats and re-alleges every allegation above as if set forth herein in full.

345.   The Rhode Island Unfair Trade Practice and Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…" R.I.G.L. § 6-13.1-2.

346.   Yamaha has engaged in unfair methods of competition and unfair or deceptive acts or practices by knowingly and intentionally concealing from Plaintiff DiOrio and the Rhode Island Subclass members the fact that the Class Motors suffer from a design defect.

347.   Yamaha's active concealment of this material safety defect constituted an unfair or deceptive act or practice, which would have the capacity to deceive an ordinary person, and did deceive Plaintiff, who relied upon the unfair or deceptive acts of Yamaha.

348.   As the result of Yamaha's unfair methods of competition and unfair or deceptive acts, Plaintiff DiOrio and the Rhode Island Subclass overpaid and were subjected to unreasonable safety risks that they otherwise would not have taken had they known the truth.  Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT X

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### Va. Code Ann. § 59.1-200 *et seq.*
### (On Behalf of Plaintiff Blatt and the Virginia Subclass Only)

349.   Plaintiff Blatt repeats and re-alleges every allegation above as if set forth herein in full.

350.   The Virginia Consumer Protection Act ("VCPA") declares unlawful "fraudulent acts or practices committed by a supplier in connection with a consumer transaction…"  Va Code Ann. § 59.1-200.

351.   Misrepresentation under the VCPA includes misrepresentation by nondisclosure.  Here, despite Yamaha's knowledge of a material defect, Yamaha failed to disclose that fact to Plaintiff Blatt, or the Virginia Subclass.

352.   Plaintiff Blatt and the Virginia Subclass relied upon Yamaha's statements and omissions, and the omissions and concealment of material facts concerning the defect caused Plaintiff Blatt and the Virginia Subclass to pay more for the Class Motors than they otherwise would have, had Yamaha not concealed and omitted the true facts about the Dry Exhaust Defect.   Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.   Moreover, they were subjected to unreasonable safety risks that they otherwise would not have taken had they known the truth.

## COUNT XI

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### Md. Code Ann., Com. Law § 13-301 *et seq.*
### (On behalf of Plaintiff Bonzella, Kratz, Krapf and the Maryland Subclass only)

353.   Plaintiff Bonzella, Kratz and Krapf repeat and re-allege every allegation above as if set forth herein in full.

354.   The Maryland Consumer Protection Act ("MCPA") declares unfair

trade practices to include any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law § 13-301.

355.   As described herein, Yamaha omitted material facts concerning the Dry Exhaust Defect.

356.   As the result of Yamaha's concealment of material facts concerning the Dry Exhaust Defect, Plaintiff Bonzella, Kratz and Krapf and the Maryland Subclass overpaid and were subjected to unreasonable safety risks that they otherwise would not have taken had they known the truth.   Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

## COUNT XII

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. STAT. ANN. § 56:8-1 *et seq.*
### (On Behalf of Plaintiff Garsetti and the New Jersey Subclass Only)

357.   Plaintiff Garsetti repeats and re-alleges every allegation above as if set forth herein in full.

358.   The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.Stat. Ann. § 56:8-2.

359.   Plaintiff Garsetti and members of the New Jersey Subclass are consumers who purchased Class Motors for personal, family or household use.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

360.   Yamaha engaged in unlawful conduct in violation of the NJCFA by knowingly and intentionally omitting to disclose to Plaintiff Garsetti and the New Jersey Subclass members the material fact that the Class Motors suffer from a design defect.

361.   Yamaha intended that Plaintiff Garsetti and all New Jersey Subclass members rely on the acts of concealment and omissions, which they did.

362.   Yamaha's conduct caused Plaintiff Garsetti and New Jersey Subclass members to suffer an ascertainable loss.  In addition to direct monetary losses, such as costs of repair, Plaintiff Garsetti and New Jersey Subclass members have suffered an ascertainable loss by receiving less than what was promised.

363.   A causal relationship exists between Yamaha's unlawful conduct and the ascertainable losses suffered by Plaintiff Garsetti and the New Jersey Subclass.  Had the Dry Exhaust Defect in the Class Motors been disclosed, Plaintiff Garsetti and the New Jersey Subclass would not have purchased the Class Motors or would have insisted on paying less.  Moreover, they were subjected to unreasonable safety risks that they otherwise would not have taken had they known the truth.

## COUNT XIII

**VIOLATIONS OF CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**(Brought on Behalf of Plaintiffs Kirsopp, Neff and the Connecticut Sub-Class)**

364.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

365.   Plaintiffs Kirsopp and Neff and members of the Connecticut Sub-Class are "persons" as set forth in Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a, *et seq*. ("CUTPA").

366.   CUTPA § 42-110b states: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

367.   Yamaha's marketing and sale of the Four Stroke Outboards constitutes violations of CUTPA § 42-110b with respect to Plaintiffs and the Connecticut Sub-Class.   Specifically, § 42-110g(a) states: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by § 42-110b, may bring an action . . . to recover actual damages."

368.   Plaintiffs Kirsopp and Neff and the Connecticut Subclass members have suffered an ascertainable loss because they did not obtain the full value of the First Generation Outboards.   Accordingly, Plaintiffs and the Connecticut Subclass have suffered injury in fact and lost money or property as a direct and proximate result of Defendant's material omissions.   As described herein, Yamaha omitted material facts concerning the Dry Exhaust Defect.

369.   As the result of Yamaha's concealment of material facts concerning the Dry Exhaust Defect, Plaintiffs Kirsopp and Neff and the Connecticut Subclass overpaid and were subjected to unreasonable safety risks that they otherwise would not have taken had they known the truth.   Had Yamaha disclosed the Dry Exhaust Defect, they would have behaved differently, by either not purchasing the outboard motors in question, or insisting on paying less for them.

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

370.   Plaintiffs Kirsopp and Neff and the Connecticut Subclass are entitled to pursue claims against Defendant during the Subclass Period for damages, injunctive relief, costs and attorneys' fees pursuant to CUTPA § 42-110g(d) to redress Defendant's violations of CUTPA § 42-110b.   Plaintiffs and the Connecticut Subclass seek damages, injunctive relief, costs, and attorneys' fees pursuant to CUTPA to remedy Defendant's violations of CUTPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs respectfully request the following relief:

a.   Certification of this case as a class action and certification of Plaintiffs herein to be adequate Class representatives and their counsel to be class counsel;

b.   The granting of injunctive relief including but not limited to a recall or free replacement program;

c.   An award of equitable restitution;

d.   An award of damages in an amount to be determined at trial;

e.   An award of costs and attorneys' fees; and

f.   The granting of such other and further relief as this Court finds necessary and proper.

## **JURY TRIAL DEMANDED**

Named Plaintiffs demand a trial by jury on all issues so triable.

DATED:  February 2, 2015

**BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.**

*/s/Manfred P. Muecke*
MANFRED P. MUECKE (222893)
mmueke@bffb.com
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone:  (619) 756-7748

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

JEFF S. WESTERMAN (94559)
jwesterman@jswlegal.com
**WESTERMAN LAW CORP.**
1900 Avenue of the Stars, 11th Floor
Los Angeles, CA  90067
Telephone: (310) 698-7880
Fax: (310) 201-9160

VAN BUNCH
*(Admitted Pro Hac Vice)*
vbunch@bffb.com
T. BRENT JORDAN
*(Admitted Pro Hac Vice)*
bjordan@bffb.com
**BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, P.C.**
2325 E. Camelback Road, #300
Phoenix, AZ  85016
Telephone:  (602) 274-1100
Fax:   (602) 274-1199

DEBRA BREWER HAYES
Of Counsel
*(Admitted Pro Hac Vice)*
dhayes@dhayeslaw.com
CHARLES CLINTON HUNTER
(Cal Bar. #93987)
**THE HAYES LAW FIRM, PC**
700 Rockmead, Suite 210
Kingwood, TX  77339
Telephone: (281) 815-4963
Fax: (832) 575-4759

STEPHEN M. HANSEN
(*Admitted Pro Hac Vice*)
**LAW OFFICES OF STEPHEN M.
HANSEN**
1821 Dock St., Unit 103
Tacoma, WA  98402
Telephone: (253) 302-5955

CHARLES J. LADUCA
(*to be admitted Pro Hac Vice*)
charles@cuneolaw.com
**CUNEO GILBERT & LADUCA,
LLP**
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone: (202) 789-3960

WILLIAM H. ANDERSON

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

1   (*Admitted Pro Hac Vice*)
    wanderson@cuneolaw.com
2   **CUNEO GILBERT & LADUCA, LLP**
3   507 C Street, NE
    Washington, DC 20002
4   Telephone: (202) 789-3960

5   MICHAEL MCSHANE
    mmcshane@audetlaw.com
6   **AUDET & PARTNERS, LLP**
    221 Main Street, Suite 1460
7   San Francisco, CA 94105
    Telephone: (415) 568-2555
8
    ROBERT K. SHELQUIST
9   (*to be admitted Pro Hac Vice*)
    rkshelquist@locklaw.com
10  **LOCKRIDGE GRINDAL NAUEN, P.L.L.P.**
11  Washington Avenue South, Suite 2200
    Minneapolis, MN 55401
12  Telephone: (612) 339-6900

13  STEVEN L. MARCHBANKS
    (214686)
14  steve@premierlegalcenter.com
15  **PREMIER LEGAL CENTER, A.P.C.**
    2550 Fifth Avenue, 9th Floor
16  San Diego, CA 92103
    Telephone: (619) 235-3200
17
    ROBERT G. LOEWRY (SBN 179868)
18  rloewry@rloewy.com
19  **LAW OFFICES OF ROBERT G. LOEWRY, P.C.**
20  610 Newport Center Drive, Suite 1200
    Newport Beach, California 92660
21  Telephone: (619) 442-7103

22  DANIEL L. WARSHAW (185365)
    dwarshaw@pswlaw.com
23  ALEXANDER R. SAFYAN (277856)
24  asafyan@pswlaw.com
    **PEARSON, SIMON & WARSHAW, LLP**
25  15165 Ventura Boulevard, Suite 400
26  Sherman Oaks, California 91403
    Telephone:  (818) 788-8300
27  Facsimile:   (818) 788-8104

28  JAMES J. PIZZIRUSSO (admitted *pro*

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

85

*hac vice anticipated*)
jpizzirusso@hausfeldllp.com
NATHANIEL GIDDINGS (*pro hac vice* anticipated)
Ngiddings@hasufeldllp.com
STEPHANIE Y. CHO
scho@hausfeldllp.com (*pro hac vice* anticipated)
**HAUSFELD, LLP**
1700 K Street NW
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:   (202) 540-7201

*Attorneys for Named Plaintiffs*

SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT