**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | Date | April 29, 2015 |
|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | |

| Present: The Honorable | BEVERLY REID O'CONNELL, United States District Judge | |
|---|---|---|
| Renee A. Fisher | Not Present | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**      (IN CHAMBERS)

### ORDER GRANTING MOTION TO DISMISS [107]

Pending before the Court is Defendant Yamaha Motor Corporation, U.S.A.'s motion to dismiss Plaintiffs' Second Amended and Consolidated Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 83.) After reviewing the parties' papers filed in support of and in opposition to this motion, in addition to hearing oral argument from the parties on the matter, the Court agrees with Defendant that Plaintiffs have failed to state a claim in their Second Amended and Consolidated Class Action Complaint. Accordingly, Defendant's motion is **GRANTED**.

## I.     BACKGROUND

### A. Factual Background

Defendant Yamaha Motor Corporation, U.S.A. ("Yamaha USA") is a wholly owned subsidiary of Yamaha Motor Co. Ltd. ("Yamaha Japan"), a Japanese corporation. (Second Am. Consol. Class Action Compl. ("SAC") ¶ 38.)[1] Yamaha USA imports and markets Yamaha Japan's products in the United States. (*See* SAC ¶ 38.) Among its business activities, Yamaha Japan designs and manufactures outboard motors for recreational boats. (Dkt. No. 78 at 1.) One model in particular lies at the center of this lawsuit: the first-generation F-series four-stroke outboard motor.

---

[1] Yamaha Japan is a Japanese corporation headquartered in Shizauka, Japan. (Dkt. No. 78.) This Court has dismissed Plaintiffs' claims in this action as to Yamaha Japan for lack of jurisdiction. (Dkt. No. 78.)

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|---|---|---|---|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

Plaintiffs are individuals who have purchased first-generation F-series outboard motors. (SAC ¶¶ 1–2, 18–37.) They allege that the first-generation F-series motor was flawed in its design, resulting in significant internal corrosion of the motor's dry exhaust system, which, if left untreated, ultimately causes the motor to fail prematurely. The SAC details the repair costs that each of the named Plaintiffs incurred after discovering corroded components of their outboard motors. It also describes the warranty coverage that Defendant provided to Plaintiffs' various products, which the Court has used to calculate the dates on which each Plaintiff's warranty expired. The following chart summarizes this information:

| Plaintiff | Model | Purchase Date | Cost of Repairs | Extended Warranty? | State of Residence | End Date of Warranty |
|---|---|---|---|---|---|---|
| George Williams | New F200 | September 6, 2003 | $1001.10 | No | Washington | September 6, 2006 |
| Lorenda Overman | New F225 | February 3, 2005 | $3118.44 | No[2] | North Carolina | February 3, 2008 |
| Geraldo Chiariello | New F225 | May 6, 2006 | $2574.88 | No | New York | May 6, 2009 |
| Charles Pencinger | Used F225 (2003 Model) | September 30, 2010[3] | $3908.63 | No | Massachusetts | December 31, 2006 |
| Steve Oetegenn | Used F225 (2004 Model) | December 31, 2006 | $31,337.62[4] | Yes | California | December 31, 2010 |
| Brian Gilderman | Used F225 (2002 Model) | October 3, 2003 | $3699.99 | Yes | Florida | January 15, 2008 |

[2] Plaintiffs alleged for the first time in the First Amended and Consolidated Class Action Complaint that Overman purchased a Yamaha Extended Service warranty, but they fail to include this allegation in the SAC.

[3] Where Plaintiffs have failed to specify the exact date of purchase, the Court will assume the latest possible date of the year provided.

[4] According to Plaintiffs, Oetegenn's repairs would have cost him a total of $24,000 (or $12,000 to repair each of the two motors he purchased). (SAC ¶ 87.) Instead of paying for repairs, however, Oetegenn purchased two new F225 outboard motors on May 03, 2012 for a total of $31,337.62. (SAC ¶ 89.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | | Date | April 29, 2015 | |
|---|---|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Joseph Ramos and Adam Jacks | Used F225 (2004 Model) | July 25, 2011 | $23,000[5] | No | California | December 31, 2007 |
| Mark Cooperman | New F225 (2005 Model) | July 31, 2005 | $7000 | Yes | New York | July 8, 2011 |
| Gerald Washington | New F225 (2004 Model) | October 31, 2003 | Not Alleged | Yes | Florida | December 31, 2009 |
| Earnest Camilleri | Used F225 (2003 Model) | December 31, 2010 | $5975.45 | No | California and Nevada | December 31, 2006 |
| Scott Markowitz | Used F225 (2003 Model) | December 31, 2008[6] | $24,000 | No | Texas | December 31, 2006 |
| Joe DiOrio | Used F225 (2003 Model) | October 5, 2007 | $2288.40 | No | Rhode Island | December 31, 2006 |
| Thomas Blatt | New F225 (2004 Model) | May 31, 2004 | $6400 | No | Virginia | May 31, 2007 |
| Matthew Bonzella | Used F225 (2002 Model) | April 30, 2008 | $5357.24 | No | Maryland | December 31, 2005 |
| Joe Garsetti | Used F225 (2003 Model) | April 24, 2009 | $2774 | Yes | New Jersey | June 18, 2009 |
| Phillip Kirsopp | Used F225 (2002 Model) | December 31, 2008 | Not Alleged[7] | No | Connecticut | December 31, 2005 |

---

[5] Ramos and Jacks allege that they had to purchase a replacement motor at this price due to "a catastrophic failure" in their engine.  (SAC ¶¶ 105–09.)

[6] Although the SAC states that Markowitz purchased his motors in 2009, (SAC ¶ 130), Plaintiffs' previous complaints have alleged that Markowitz purchased them in 2008, (see, e.g., Dkt. No. 80 at 36).

[7] Plaintiffs allege that Kirsopp "was forced to pay several thousand dollars to replace the motor's exhaust," but they do not allege a specific number.  (SAC ¶ 166.)  Plaintiffs similarly allege that Neff's damages totaled "several thousand dollars."  (SAC ¶ 175.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | | Date | April 29, 2015 | |
|---|---|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | | | |

| William Kratz | Used F225 (2003 Model) | December 31, 2005 | ~$1000 | No | Maryland | December 31, 2006 |
|---|---|---|---|---|---|---|
| William Neff | Used F225 (2002 Model) | December 31, 2008 | Not Alleged | No | Connecticut | December 31, 2005 |
| James Krapf | Used F225 (2002 Model) | December 31, 2010 | $6000 | No | Maryland | December 31, 2005 |

(SAC ¶¶ 18–37, 53–180; Dkt. No. 78 at 16–17; Dkt. No. 95 at 2–3; *see also Philip Kirsopp et al. v. Yamaha Motor Co. Ltd. et al.*, Case No. CV 14-00496 BRO (VBKx) (C.D. Cal. Jan. 7, 2015) (Dkt. No. 52 at 2–3).)

Plaintiffs allege that many other consumers across the country—totaling "thousands or tens of thousands"—have experienced similar problems with corrosion in their Yamaha F225 motors.  (SAC ¶¶ 271–72.)  They also allege that Defendant knew of a hidden dry exhaust defect in the first-generation motors that causes premature corrosion but failed to warn consumers of this risk.  (SAC ¶¶ 181–229.)  In support of their contention that Defendant had presale knowledge of this defect, Plaintiffs provide the following factual allegations:  First, Plaintiffs allege that Defendant "knew or by the exercise of reasonable care should have known and had reason to know of the Dry Exhaust Defect at the time of roll out of the model year 2000 Class Motors as the result of its pre-market testing procedures, pre-release testing data and engineering research related to the dry exhaust system."  (SAC ¶ 183.)  Second, Plaintiffs allege that in 2001 Defendant began to receive numerous complaints from customers regarding dry exhaust corrosion, which prompted Defendant to create a marine-only customer relations service department in Kennesaw, Georgia that staffed two dozen customer service employees who were tasked with handling all the complaints.  (SAC ¶¶ 185–92.)  Third, Plaintiffs claim that Defendant began receiving similar complaints its own authorized dealers, who informed Defendant that "the corroded parts were rotted out beyond repair and needed to be replaced entirely."  (SAC ¶ 194.)  Fourth, Plaintiffs allege in the SAC that "[i]n or around 2002," Defendant developed a dry exhaust "kit" of replacement parts to address the corrosive effect of the dry exhaust defect.  (SAC ¶¶ 201–07.)  Next, Plaintiffs allege that Defendant "revamped" the dry exhaust system in developing the second-generation

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | | Date | April 29, 2015 |
|---|---|---|---|---|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | | |

motors while continuing to sell the first-generation motors.  (SAC ¶¶ 208–16.)  And finally, Plaintiffs allege that Defendant engaged in a concerted and company-wide effort to blame the customers by attributing the premature corrosion to a "lack of maintenance," a strategy which Plaintiffs label "a purposeful diversion from the real issue, the Dry Exhaust Defect."  (SAC ¶¶ 217–28.)  As a result, Plaintiffs contend that Defendant must have known of the corrosion problem, and that it therefore had a duty to disclose this information to the putative class members.  (SAC ¶¶ 230–62.)

## B. Procedural History

Believing that Defendant breached express and implied warranties and violated various statutes, Plaintiffs filed three separate lawsuits.  *See George Williams v. Yamaha Motor Co. Ltd.*, No. 13-cv-05066; *Brian Gilderman v. Yamaha Motor Corporation USA*, No. 13-cv-01225; *Joseph Ramos v. Yamaha Motor Co. Ltd.*, No. 13-cv-07949.  Plaintiffs filed the earliest action on July 15, 2013.  (Dkt. No. 1.)  The Court consolidated these actions into the instant lawsuit on January 31, 2014.  (Dkt. No. 53.)

On February 20, 2014, Plaintiffs Chiariello, Gilderman, Jacks, Oetegenn, Overman, Pencinger, Ramos, and Williams filed a Consolidated Class Action Complaint.  (Dkt. No. 57.)  Both Yamaha USA and Yamaha Japan filed motions to dismiss on March 13, 2014.  (Dkt. Nos. 62, 63.)  On August 19, 2014, the Court dismissed in whole Plaintiffs' action as to Yamaha Japan for lack of personal jurisdiction and dismissed in part Plaintiffs' action as to Yamaha USA for failure to state a claim, granting Plaintiffs leave to amend their claims against Yamaha USA.  (Dkt. No. 78.)  On September 12, 2014, Plaintiffs filed its First Amended and Consolidated Class Action Complaint.  (Dkt. No. 80.)  On Yamaha USA's motion, the Court dismissed Plaintiffs' First Amended and Consolidated Class Action Complaint on January 7, 2015.  (Dkt. No. 95.)  In doing so, the Court dismissed Plaintiffs' warranty and unjust enrichment claims with prejudice but again granted Plaintiffs leave to amend their consumer fraud claims.  (Dkt. No. 95 at 27.)  That same day, the Court dismissed plaintiffs' similar claims in the related action of *Philip Kirsopp et al. v. Yamaha Motor Co. Ltd. et al.*, No. CV 14-00496 (Dkt. No. 54 at 20), granting the *Kirsopp* plaintiffs leave to amend their consumer fraud claims as well.  On February 2, 2015, however, the *Kirsopp* plaintiffs filed a notice of voluntary dismissal.  *Id.* (Dkt. No. 57.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | CV 13-05066 BRO (VBKx) | Date | April 29, 2015 |
|----------|------------------------|------|----------------|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | |

Also on February 2, 2015, Plaintiffs filed their SAC, which now included the *Kirsopp* plaintiffs along with their consumer fraud claims. (Dkt. No. 98.) The SAC alleges thirteen causes of action for violations of various states' consumer protection acts, all on the theory that Yamaha USA fraudulently omitted material information regarding the dry exhaust defect in its first-generation motors. (*See generally* SAC.) Yamaha USA then brought the instant motion to dismiss on March 2, 2015, arguing that Plaintiffs had failed to cure the pleading deficiencies identified by the Court in its previous dismissal orders. (Dkt. No. 107.) Plaintiffs opposed this motion on March 30, 2015, (Dkt. No. 108), and Yamaha replied on April 13, 2015, (Dkt. No. 109). The Court then heard oral argument of counsel on April 27, 2015.[8]

## II.   LEGAL STANDARD

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. *Id.*

---

[8] Defendant has requested that the Court take judicial notice of various documents, including a transcript of the Court's hearing on Defendant's previous motion to dismiss as well as certain documents of which the Court has already taken judicial notice in its prior orders. (Dkt. No. 107-1.) In opposition, Plaintiffs merely request that the Court consider the entirety of Defendant's Owner's Manual, rather than simply the excerpts of that Manual that are included as Exhibit C to Defendant's supplemental request for judicial notice. (Opp'n at 1 n.1.) To the extent that these documents are relevant to the Court's analysis, both parties' requests are **GRANTED**. (*See* Dkt. No. 95 at 5–6; Fed. R. Evid. 201; *Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).)

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | | Date | April 29, 2015 |
|---|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | | |

Where a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."). But leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & Cnty. of S.F.*, 656 F.3d 1002, 1008 (9th Cir. 2011).

## III.    DISCUSSION

All that remains of Plaintiffs' claims are various consumer fraud claims based on different states' consumer protection laws. As the Court's previous orders have explained, each of these causes of action requires either an affirmative misrepresentation or an omission of material fact. (Dkt. Nos. 78 at 23, 95 at 14.) In the SAC, Plaintiffs do not assert a theory of affirmative misrepresentation, relying entirely on their allegations that Defendant fraudulently omitted material information.[9] The Ninth Circuit has held that a manufacturer's duty to disclose outside the warranty period is limited to defects that present an "unreasonable safety hazard." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1143 (9th Cir. 2012). Each party's analysis in support of or in opposition to this motion therefore focuses on whether Plaintiffs have adequately pleaded facts demonstrating that (1) a defect in the motors presented an unreasonable safety risk, and (2) Defendant had presale knowledge of that defect. As discussed below, because the Court finds that Plaintiffs have again failed to plead sufficient facts to establish the second element, the Court **GRANTS** Defendants' motion to dismiss.

### A. Plaintiffs Have Adequately Pleaded an Unreasonable Safety Hazard

To begin, Plaintiffs argue that Defendant's failure to disclose the alleged defect is actionable because the defect presented an "unreasonable safety hazard." (Opp'n at 6

---

[9] "A failure to disclose a fact can constitute actionable fraud or deceit in four circumstances: (1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (Cal. Ct. App. 2011).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | Date | April 29, 2015 |
|----------|------------------------|------|----------------|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | |

(quoting *Wilson*, 668 F.3d at 1141, 1143).) "In order to state a claim for failing to disclose a safety defect, Plaintiffs must allege (1) the existence of a design defect; (2) the existence of an unreasonable safety hazard; (3) a causal connection between the alleged defect and the alleged safety hazard; and [4] that the manufacturer knew of the defect at the time a sale was made." *Apodaca v. Whirlpool Corp.*, No. SACV 13-00725 JVS, 2013 WL 6477821, at *9 (C.D. Cal. Nov. 8, 2013). Plaintiffs have repeatedly asserted this theory in their pleadings on the basis that the alleged design defect causes an unreasonable safety hazard to consumers.

The Court has rejected this argument twice in its prior orders, relying principally on *Birdsong v. Apple Inc.*, 590 F.3d 955, 961 (9th Cir. 2009), and *In re Porsche Cars North America Inc.*, 880 F. Supp. 2d 801 (N.D. Ohio 2012). (*See* Dkt. Nos. 78 at 25, 95 at 18–19.) Nevertheless, the Court granted Plaintiffs leave to amend on this issue because Plaintiffs' counsel had indicated that multiple Plaintiffs' engines overheated or "smoked out" while at sea. (Dkt. No. 95 at 19.) The Court made clear, however, that Plaintiffs' allegations must "amount to more than 'hypothetical' injuries" in order "to raise the safety risks above the level of mere speculation." (Dkt. No. 95 at 18 (quoting *Birdsong*, 590 F.3d at 961); *accord Smith v. Ford Motor Co.*, 462 F. App'x 660, 663 (9th Cir. 2011) (finding "'safety' concerns raised by plaintiffs [to be] too speculative, as a matter of law, to amount to a safety issue giving rise to a duty of disclosure").) In amending their complaint, Plaintiffs have provided additional factual allegations in the SAC in support of the notion that the alleged defect presents an unreasonable safety hazard. The two alleged safety risks identified by Plaintiffs in the SAC are (1) the risk of an onboard fire, and (2) the risk of accident and associated injuries. (Opp'n at 7–15.)

Plaintiffs argue that they have sufficiently pleaded that the alleged defect creates the risk of an onboard fire. Clearly, the incidence of an onboard fire during use constitutes an unreasonable safety hazard. But Plaintiffs do not allege that a single Plaintiff or class member has actually experienced such an occurrence. Rather, the closest any Plaintiff has come to an onboard fire are the following allegations:

- Plaintiff Oetegenn's engine "smoked out and began to emit blue smoke during operation";

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|----------|---------------------------|------|----------------|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

- Plaintiff DiOrio's engine "overheated on multiple occasions necessitating that the engine be shut down";

- Plaintiff Blatt's motor "overheated on repeated occasions"; and

- Plaintiff Overman's motor "overheated and also quickly thereafter blew up during operation."

(SAC ¶¶ 238–41.)[10]  The allegation that contrasts starkly with the other allegations from the SAC is the assertion that Overman's motor "blew up."  (SAC ¶¶ 241, 252.)  During oral argument, however, Plaintiffs' counsel clarified that Overman's motor did not actually explode, as the phrase "blew up" would seem to connote; rather, it merely stopped working, much like the other Plaintiffs' engines.[11]  None of the other allegations indicates that a Plaintiff actually experienced an onboard fire.

Nevertheless, Plaintiffs correctly argue that they are not required to allege that a fire actually took place in order to successfully plead an unreasonable safety hazard giving rise to a duty to disclose.  *See Apodaca*, 2013 WL 6477821, at *9 ("[T]he Court does not find Plaintiff Apodaca must wait until his dishwasher actually catches fire to allege sufficiently the nexus between the defect and the safety hazard."); *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 918 (C.D. Cal. 2010) (noting that plaintiffs need not "plead that consumers have been injured by the alleged unreasonable safety risk").  But it is not enough to allege a theoretical possibility that a fire *could* occur.  Rather, "[t]o establish a duty to disclose based on a safety issue, Plaintiff[s] . . . must allege 'an instance of physical injury *or* a safety concern as well as a "sufficient nexus" between the alleged defect and the safety issue.'"  *Apodaca*, 2013 WL 6477821, at *9 (emphasis added) (quoting *Grodzitsky v. Am. Honda Motor Co.*, No. 2:12-cv-1142-SVW-PLA, 2013 WL 2631326, at *5 (C.D. Cal. June 12, 2013)).  Because there has been no "instance of

---

[10] In addition, Plaintiffs allege that various users of online forums have reported overheating problems from using Defendant's motors, including one user who stated that his motor "started blowing smoke." (SAC ¶¶ 242–44.)

[11] Plaintiffs' counsel characterized it as a "catastrophic engine failure."  In response to further questioning from the Court, Plaintiffs' counsel clarified that the engine did not explode.

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|---|---|---|---|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

physical injury," Plaintiffs must therefore allege a "sufficient nexus" between the safety concern (an onboard fire) and the alleged defect.

The relevant inquiry thus boils down to whether Plaintiffs have alleged a sufficient causal connection between the purported defect and an onboard fire. Plaintiffs argue in opposition that several paragraphs from the SAC establish this causal nexus because they explain "how the corrosion [from the defect] could cause a risk of an on-board fire." (Opp'n at 7.) Specifically, the SAC states:

> 235. A leak of flammable engine oil which can occur when corroded dry exhaust parts crack or break down is hazardous. When engine oil enters areas it is not supposed to, particularly the very hot dry exhaust components of the First Generation Outboards, it begins to burn. When engine oil burns in a dry exhaust chamber, the boat operator is essentially dealing with an on-board fire.

> 236. Another risk of an on-board fire comes from the overheating of already hot engines which can occur when corroded dry exhaust parts crack, break down or develop holes. In these instances, water can leak into the dry exhaust from the wet side exhaust which is continually running water around the outside of the dry exhaust area in order to control temperatures. If not enough water is able to run through the wet exhaust, because water is escaping into the dry exhaust, then the First Generation Outboards can overheat.

(SAC ¶¶ 235–36.) The SAC also states that "[f]or marine engines, corrosion is a key aspect of failure and risk analysis because it is well known and established in the industry that it can lead to engine failure and other associated problems." (SAC ¶ 183(ii).)

Plaintiffs analogize their case to *Apodaca*, in which the court held that the plaintiff had adequately alleged a sufficient nexus between a design defect and the unreasonable safety hazard of a dishwasher catching fire. 2013 WL 6477821, at *9. There, the court reasoned that plaintiff had explained "in great detail" in his complaint "how moisture can reach the wiring, how moisture on the wiring can cause overheating, and that overheating can lead to a fire." *Id.* Noting "the tight causal relationship alleged" between the design

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|----------|---------------------------|------|----------------|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

defect and the safety hazard, the court found that plaintiff need not "wait until his dishwasher actually catches fire to allege sufficiently the nexus between the defect and the safety hazard. While catching fire would be the extreme result of this causal chain, the [complaint] sufficiently alleges its possibility as a logical outcome." *Id.* While this is a closer call, the Court nevertheless finds that Plaintiffs have adequately explained the causal nexus between (1) the corrosion due to the defect; (2) consequential leaking of oil into other parts of the engine; which certain Plaintiffs experienced, (*see* SAC ¶¶ 54,[12] 100, 123); (3) the oil beginning to burn after coming into contact with the "very hot dry exhaust components" of the motors, (SAC ¶ 235); and (4) an onboard fire developing.

These allegations distinguish this case from the two cases relied upon by Defendant in its motion: *Wilson*, 668 F.3d at 1143–45, and *Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1137 (N.D. Cal. 2013). In *Wilson*, the plaintiffs based their consumer fraud claim on allegations that a defect in a laptop's design weakened the connection between the power jack and the mother board, and that this defect caused laptops to ignite and catch fire. 668 F.3d at 1143–44. While the court noted that laptop ignition constituted a safety hazard, it found that the plaintiffs had failed to allege a sufficient causal nexus because they did not sufficiently explain how a defective power jack could cause the laptops to catch fire. *Id.* at 1144–45. As the court explained:

> In the case at bar, the complaint goes into some detail as to how normal use of the Laptops (*i.e.*, turning them on and off, plugging in an a/c adapter) causes the connection between the power jack and the motherboard to weaken, resulting in a loss of power to the Laptops. The complaint, however, does not allege how the weakening or loss of the connection between the power jack and the motherboard causes the Laptops to ignite. The complaint merely states that when Kruschen plugged in his computer and turned it on, the Laptop emitted "heavy smoke, flames, and sparks from the left side of the Laptop (close to the power jack)." The complaint is silent on whether the power jack's becoming disconnected in any way led to

---

[12] As Defendant argues, it is unclear from Plaintiffs' prior pleadings whether Williams's leak was caused by the alleged defect or from a collision with a log. Both Gilderman and Washington, however, allege that they noticed oil leaking in their engines, after which they discovered corrosion in their motors. (SAC ¶¶ 100, 123.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | | Date | April 29, 2015 |
|---|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | | |

Kruschen's Laptop's catching fire.  Some of the customer complaints do minimally allege such a causal connection, such as "[a]t the time when the power jack completely failed, smoke began to flow rapidly from inside the computer."  These statements, however, are not accompanied by any supporting factual basis.

Plaintiffs simultaneously allege that the design defect cuts off power from the Laptops and that the Laptops can ignite into flames through normal use.  But it is difficult to conceive (and the complaint does not explain) how the Laptops could ignite if they are "unable to receive an electrical charge." The present case is therefore distinguishable from those cases surviving a motion to dismiss where the alleged design defect could conceivably lead to a safety hazard.

As Plaintiffs do not plead any facts indicating how the alleged design defect, *i.e.*, the loss of the connection between the power jack and the motherboard, causes the Laptops to burst into flames, the District Court did not err in finding that Plaintiffs failed to plausibly allege the existence of an unreasonable safety defect.

*Id.* at 1144 (internal citations and footnotes omitted).  Simply put, without any sound explanation in the complaint, it was not plausible that a weakened power connection could cause a computer to burst into flames.

Following *Wilson*, the court addressed similar claims in *Elias*, 950 F. Supp. 2d at 1136–37.  There, the court found that the plaintiff had failed to establish a sufficient nexus demonstrating "that due to the insufficient power supply, [the defendant's] computers were more likely to 'overheat, short out, melt and catch fire, creating a significant safety risk.'"  *Id.*  As in *Wilson*, the court found that the plaintiff had failed to explain how a lack of power supply could subsequently cause a computer fire:

Plaintiff claims that an inadequate power supply may send "voltage surges" through the computer, and then makes a hypothetical proposition that his computer was thus more likely to "catch fire."  However, Plaintiff does not cite to any facts beyond his own hypotheticals and conjectures to show a

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|---|---|---|---|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

nexus between the allegedly deficient power supply, voltage surges, and fires. Such a cursory reference does not establish a sufficient nexus between the alleged defect and safety hazard, and does not impart HP with a duty to disclose.

*Id.* (citations omitted).

By contrast, the causal chain alleged in Plaintiffs' SAC—which explains how oil leaking from corroded motor parts can begin burning and start a fire once it comes into contact with hot exhaust components of a motor—is far more plausible than those described in *Wilson* and *Elias*. As a result, although no Plaintiffs have experienced an actual fire, the Court finds that the "tight causal relationship alleged" in the SAC is sufficient to allege "the possibility" of an onboard fire as "a logical outcome." *Apodaca*, 2013 WL 6477821, at *9. Accordingly, the Court finds that Plaintiffs have sufficiently pleaded an unreasonable safety hazard supporting a duty to disclose.[13]

## B. Plaintiffs Have Failed Adequately to Plead that Defendant Had Presale Knowledge of the Alleged Defect

As the Court has explained in its prior orders, presale knowledge of a product defect is also a required element of claims brought under each of the statutes invoked by Plaintiffs.[14] In previously dismissing Plaintiffs' consumer fraud claims, the Court noted

---

[13] Because the Court finds the risk of an onboard fire to present an unreasonable safety hazard, it does not address Plaintiffs' arguments regarding the risk of accidents and associated injuries.

[14] *See Wilson*, 668 F.3d at 1145 (California consumer fraud claims); *Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F. Supp. 380, 387 (D. Conn. 1994) (Connecticut Unfair Trade Practices Act); *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988) (Massachusetts Consumer Protection Act); *Allen v. Bank of Am., N.A.*, 933 F. Supp. 716, 727 (D. Md. 2013) (Maryland Consumer Protection Act); *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 927 (N.D. Cal. 2012) (Washington Consumer Protection Act claim); *Matthews v. Am. Honda Motor Co.*, No. 12-60630-CIV, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012) (Florida Deceptive and Unfair Trade Practices Act); *Woods v. Maytag Co.*, No. 10-CV-0559 ADS WDW, 2010 WL 4314313, at *16 (E.D.N.Y. Nov. 2, 2010) (New York General Business Law § 349); *Gale v. Value Line, Inc.*, 640 F. Supp. 967, 972 (D.R.I. 1986) (Rhode Island Unfair Trade Practice and Consumer Protection Act); *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (N.J. 1994) (New Jersey Consumer Fraud Act); *Ramsey v. Keever's Used Cars*, 92 N.C. App. 187, 191 (N.C. Ct. App. 1988) (North Carolina Unfair and Deceptive Trade Practices Act); *Doe v. Boys*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | CV 13-05066 BRO (VBKx) | Date | April 29, 2015 |
|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | |

that "without any specific allegation demonstrating Defendant's knowledge during a timeframe when a Plaintiff purchased one of Defendant's motors, the Court cannot reasonably conclude that Plaintiffs have adequately alleged Defendant's presale knowledge of any defect." (Dkt. No. 95 at 20.)  Accordingly, in amending their complaint, Plaintiffs were required to allege specific facts demonstrating that Defendant had knowledge of the alleged defect during a time when Defendant was still selling these motors—that is, before 2005. (*See* Dkt. No. 95 at 20 (noting that Plaintiffs had conceded in their pleadings that Defendant stopped selling its first-generation motors in 2004).) Plaintiffs raise five primary arguments as to how they have now sufficiently alleged presale knowledge by Defendant in the SAC.  As discussed below, the Court finds that Plaintiffs have again failed adequately to plead presale knowledge by Defendant.

### 1. Defendant's "Exclusive Access" to Engineering, Research, and Testing Data

First, Plaintiffs argue that Defendant "knew, or by the exercise of reasonable care should have known, of the defect" as a result of its "exclusive access and control over engineering, research and testing data developed in 1999 or earlier, prior to the final design and manufacture of the outboards in 2000." (Opp'n at 16 n.10, 17 (quoting *Kowalsky v. Hewlett-Packard Co.*, No. 10-CV-02176-LHK, 2011 WL 3501715, at *1 (N.D. Cal. Aug. 10, 2011)); SAC ¶ 181.)  Due to this access, Plaintiffs allege that Defendant must have had presale knowledge "as the result of its pre-market testing procedures, pre-release testing data and engineering research related to the dry exhaust system." (SAC ¶ 183.)  Plaintiffs then provide significant details in the SAC regarding the importance of risk analysis in developing a marine engine design, a process that requires extensive corrosion testing before releasing the product into the market. (SAC ¶¶ 183(i)–(vii).)  As Plaintiffs explain, "Properly conducted tests would have discovered the extreme corrosive effects of the combination of the high exhaust gas and chamber temperatures (exacerbated by the shorter exhaust system in the First Generation Outboards), the exposure to salt water exhaust vapor, the presence of corrosive exhaust gas ions, and the absence of oxygen in the dry exhaust chamber." (SAC ¶ 184.)

---

*Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479 (Tex. 1995) (Texas Deceptive Trade Practices Act); *Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 714 (Va. 2001) (Virginia Consumer Protection Act).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|---|---|---|---|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

Plaintiffs rely on *Kowalsky v. Hewlett-Packard Co.*, 2011 WL 3501715, for the proposition that "recognized" pre-release tests of a product can establish the presale knowledge of a manufacturer.  For two reasons, however, *Kowalsky* is distinguishable from the case at bar.  First, Plaintiffs do not allege that Yamaha USA is a manufacturer.  In fact, Plaintiffs specifically concede that Yamaha's *parent company*—Yamaha Japan— is "the manufacturer of the engines."  (SAC ¶ 200; *accord* Dkt. No. 38 at 25–26.)  As a result, tests that a *manufacturer* must perform that may reveal a defect cannot establish presale knowledge on behalf of a distributor such as Yamaha USA.  Second, in *Kowalsky* the plaintiff had alleged that the defendant's advertisements asserted that the defendant adhered to "the recognized ISO/IEC 24734 and 24735 standards."  2011 WL 3501715, at *2, 4.  Consequently, it was plausible to infer that the defendant had performed the prerelease tests that were *legally required* in order to meet these standards.  *See id.* at *4 ("The 24735 standard requires multiple tests using repeated scanning of a multi-page document through the printer's ADF.").  By contrast here, Plaintiffs have not alleged any facts demonstrating even that the manufacturer (Yamaha Japan) necessarily performed these tests, alleging only in essence that the manufacturer would be negligent if it did not do so.  (*See, e.g.*, SAC ¶¶ 183 ("Yamaha knew or by the exercise of reasonable care should have known and had reason to know of the Dry Exhaust Defect at the time of roll out of the model year 2000 Class Motors as the result of its pre-market testing procedures, pre-release testing data and engineering research related to the dry exhaust system."); 183(i) ("Before the release of a combustion engine in the marketplace, a risk analysis . . . should be and is an integral part of any standard design research . . . ."); 184 ("Properly conducted tests would have discovered the extreme corrosive effects of the combination of the high exhaust gas and chamber temperatures (exacerbated by the shorter exhaust system in the First Generation Outboards), the exposure to salt water exhaust vapor, the presence of corrosive exhaust gas ions, and the absence of oxygen in the dry exhaust chamber.").)[15]

In rejecting a similar argument in its prior dismissal order, the Court reasoned that similar allegations regarding Defendant's exclusive access to engineering data "require

---

[15] Plaintiffs also allege: "Properly conducted, these cyclical tests, *which Yamaha at least now claims to perform*, would have made the Defect plain."  (SAC ¶ 183(vii).)  Although a statement by Defendant that it actually performed these cyclical tests would strengthen Plaintiffs' allegations, Plaintiffs do not allege any facts supporting their allegation that Defendant has somewhere "claim[ed] to perform" them.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|---|---|---|---|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

the Court to draw the inference that Defendant's *opportunity* to learn about this alleged
defect before selling their engines to the public necessarily means that they *did* learn
about the defect." (Dkt. No. 95 at 20.) In the SAC, Plaintiffs' allegations regarding the
prerelease tests that they believe Defendant should have performed remain speculative.
*See, e.g.*, *Wilson*, 668 F.3d at 1147 ("The allegation that HP, as the manufacturer, had
'access to the aggregate information and data regarding the risk of overheating' is
speculative and does not suggest how any tests or information could have alerted HP to
the defect."); *Tietsworth v. Sears, Roebuck & Co.*, No. 5:09-CV-00288 JFHRL, 2009 WL
3320486, at *2 (N.D. Cal. Oct. 13, 2009) (finding conclusory the allegation that
defendants were in a "superior position to know the truth about the [product]");
*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 974 (N.D. Cal. 2008) (holding that
plaintiff's allegation that defendant had "exclusive knowledge as the manufacturer" did
not support claim that defendant was aware of a defect); *cf. Falk v. Gen. Motors Corp.*,
496 F. Supp. 2d 1088, 1096 (N.D. Cal. 2007) (finding that plaintiffs adequately alleged
defendant's presale knowledge of defect based on defendant's exclusive knowledge of
information that defendant *actually had* rather than information plaintiffs speculated
defendant had). Accordingly, Plaintiffs have failed to plead sufficient facts relating to
Defendant's access to presale engineering data to lead the Court to draw the reasonable
inference that Defendant had presale knowledge of the alleged defect.

### 2. Consumer Complaints

Second, Plaintiffs allege that Defendant had presale knowledge of the alleged
defect due to customer complaints it received "[a]t least by 2001." (SAC ¶ 185.) Yet
while Plaintiffs allege that Defendant began to receive these complaints "[f]rom 2001
onward," and that Defendant received so many complaints in 2001 that it decided to
devote a fully staffed customer relations service department to address them, (SAC
¶¶ 186–92), nowhere in the SAC do Plaintiffs identify even a single customer who
complained during this timeframe. In fact, the earliest complaint identified in the SAC is
dated July 4, 2005, and that complaint was found on an online forum called "iboats.com"
without any indication that this complaint was ever communicated to Defendant. (SAC
¶¶ 221, 242.) The SAC does identify a customer relations manager who purportedly
oversaw this customer relations service department, and it also describes the "unusual
volume of customer complaints regarding corrosion for one of Yamaha's product lines,
especially this soon in the life of the engines." (SAC ¶¶ 186, 188.) As Defendant argues,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

| Case No. | CV 13-05066 BRO (VBKx) | Date | April 29, 2015 |
|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | |

however, this allegation is inherently inconsistent with Plaintiffs' overarching theory of the defect. Plaintiffs have consistently alleged that the defect does not manifest until 500–700 hours of use, "which for a typical consumer using the boat 100 hours a year would take *five to seven years to achieve*." (SAC ¶ 232 & n.11 (emphasis added).)[16] Plaintiffs fail to reconcile this position—which they have maintained throughout this case—with their new allegations that Defendant started receiving customer complaints related to the defect almost immediately after the first-generation motors hit the market.

Moreover, the Ninth Circuit has echoed doubt expressed by other courts "that customer complaints in and of themselves adequately support an inference that a manufacturer was aware of a defect, noting that complaints posted on a manufacturer's webpage 'merely establish the fact that some consumers were complaining. By themselves they are insufficient to show that [the manufacturer] had knowledge [of the defect]." *Wilson*, 668 F.3d at 1147 (quoting *Berenblat v. Apple, Inc.*, Nos. 08-4969 JF (PVT), 09-1649 JF (PVT), 2010 WL 1460297, at *9 (N.D. Cal. Apr. 9, 2010) (holding that an unspecified number of complaints posted on the defendant's website was insufficient to show that the defendant had knowledge of an alleged defect)).[17]

---

[16] (*Accord* SAC ¶ 211 ("the corrosion problem . . . typically took 500 to 700 engine hours to manifest"); Dkt. No. 80 (First Amended and Consolidated Class Action Complaint) ¶¶ 62 ("after only approximately 500 to 700 hours of use, the outward signs and tell-tale symptoms appear"), 65 ("the problems only became noticeable after 500 to 700 hours of use"); *see also* Dkt. No. 87 at 21 ("visible symptoms typically occurred after 500 to 700 hours of use").)

[17] *Accord Grodzitsky v. Am. Honda Motor Co.*, No. 2:12-CV-1142-SVW-PLA, 2013 WL 690822, at *7 (C.D. Cal. Feb. 19, 2013) (finding ten online customer complaints to be "insufficient to show that Defendant had knowledge of the Window Regulator Defect at the time of sale" because the complaints were either submitted after the plaintiffs purchased their vehicles or posted on a website having nothing to do with the defendant); *Rice v. Sunbeam Prods., Inc.*, No. CV 12-7923-CAS-AJWX, 2013 WL 146270, at *7 (C.D. Cal. Jan. 7, 2013) (finding allegations that "defendant had knowledge based on unspecified 'customer service/warranty service call center records for returns and/or complaints'" to be "lacking in factual support or specificity as to defendant's knowledge of the purported defect"); *Baba v. Hewlett-Packard Co.*, No. C 09-05946 RS, 2011 WL 317650, at *3 (N.D. Cal. Jan. 28, 2011) ("Awareness of a few customer complaints . . . does not establish knowledge of an alleged defect."); *see also Oestreicher*, 544 F. Supp. 2d at 974 n.9 ("Random anecdotal examples of disgruntled customers posting their views on websites at an unknown time is not enough to impute knowledge upon defendants. There are no allegations that Alienware knew of the customer complaints at the time plaintiff bought his computer."); *McQueen v. BMW of N. Am., LLC*, No. CIV.A. 12-06674 SRC, 2014

---

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|---|---|---|---|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

Nevertheless, the court in *Wilson* conceded that "the amassed weight of [customer] complaints together with other indications that [the defendant] had knowledge of the defect" may be sufficient to survive a motion to dismiss. 668 F.3d at 1147. As discussed above, however, Plaintiffs have not identified any complaints with specificity, relying instead on vague allegations regarding the "unusual" number of complaints. This is insufficient under *Wilson* and its progeny. For example, in *Fisher v. Honda North America, Inc.*, the plaintiffs alleged that the defendant actually tracked the website where there had been "many complaints" logged about the purported defect, and the compliant specifically identified examples of these complaints. No. LA CV13-09285 JAK, 2014 WL 2808188, at *5 (C.D. Cal. June 12, 2014). Noting that only one of these examples "pre-dated the sale of the Accord to Plaintiff in 2009," however, the court discounted the allegations of the other complaints and found that "[i]t [wa]s not plausible to suggest that Honda was on notice of the defect 'at the time of sale' based on one customer complaint." *Id.* Here, Plaintiffs' theory of knowledge based on customer complaints is even further attenuated, as they have failed to allege even a single complaint that predates the sale of any first-generation motor. Accordingly, Plaintiffs have failed to demonstrate Defendant's presale knowledge on this theory as well.

### 3. Pre-2005 Warranty Claims

Third, Plaintiffs allege that Defendant must have had knowledge of the defect because, "beginning in 2001 and continuing thereafter," Defendant "received many warranty claims arising out of the Dry Exhaust Defect." (SAC ¶¶ 193–98.) This theory fails for the same reasons discussed above. That is, it is implausible to infer both that the defect took five to seven years to manifest for most ordinary customers—a notion supported by the fact that none of the twenty named Plaintiffs sought repairs during the warranty periods, (*see* Dkt. No. 95 at 12)—and that "many" customers were submitting

---

WL 656619, at *4 (D.N.J. Feb. 20, 2014) (noting that allegations "that BMW had 'notice' or 'knowledge' of the alleged defect because of 'consumer complaints' or 'demands for repairs,' are of little utility to Plaintiff at the motion to dismiss stage because they provide no facts describing those complaints or demands"); *Durso v. Samsung Elecs. Am., Inc.*, No. 2:12-CV-05352 DMC, 2013 WL 5947005, at *10 (D.N.J. Nov. 6, 2013) (finding online customer complaints from 2011 insufficient "for the Court to draw an inference that the Washers were defective from the time of manufacture and that Samsung knew that fact as early as 2004").

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | Date | April 29, 2015 |
|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | |

warranty claims as a result of this defect beginning in 2001.  In addition, this theory is
similarly speculative because it requires the Court to infer that Defendant's exposure to
these warranty claims necessarily led it to discover a defect causing premature corrosion.
*See Fisher*, 2014 WL 2808188, at *5 ("[T]he allegations that Honda should have known
of the defect due to the number of repair requests and replacement mechanisms 'likely'
made or ordered are speculative.").

### 4.  The Replacement Kit

Plaintiffs' fourth theory regarding Defendant's presale knowledge concerns the
development of a "replacement kit" that the SAC asserts Defendant developed and made
available to its dealers "[i]n or around 2002."  (SAC ¶ 202.)  As Defendant argues,
however, Plaintiffs have consistently alleged throughout this litigation that Defendant
first introduced this "kit" in 2006, not 2002.  (*See, e.g.*, Dkt. No. 66 at 32.)  Plaintiffs
claim in their opposition that this earlier date "emerged from details learned in Plaintiffs'
renewed investigation."  (Opp'n at 18 n.12.)  Plaintiffs also argue that it is improper for
Yamaha to dispute their factual allegations in a motion to dismiss because all factual
allegations must be accepted as true.  While that is correct, the Rule 12(b)(6) standard
does not permit Plaintiffs to contradict allegations made in a prior complaint.  *See Reddy
v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990) ("Although leave to amend
should be liberally granted, the amended complaint may only allege other facts consistent
with the challenged pleading." (internal quotation marks omitted)); *Azadpour v. Sun
Microsystems, Inc.*, No. C06-03272 MJJ, 2007 WL 2141079, at *2 (N.D. Cal. July 23,
2007) ("Where allegations in an amended complaint contradict those in a prior complaint,
a district court need not accept the new alleged facts as true, and may, in fact, strike the
changed allegations as false and sham." (internal quotation marks omitted)).

When pressed on this issue during oral argument, Plaintiffs' counsel stated that
Plaintiffs were unaware of the precise date on which Defendant made these kits publicly
available, but that their "investigation" had led them to discover that Defendant was
developing these kits as early as 2002.[18]  Were Plaintiffs able to explain precisely what
*facts* they discovered in their investigation that led them to believe that Defendant

---

[18] Plaintiffs' counsel also indicated during oral argument that Defendant had been selling this kit "in one
offs" before releasing it publicly, although he provided no facts to support this contention.

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | **CV 13-05066 BRO (VBKx)** | Date | April 29, 2015 |
|----------|---------------------------|------|----------------|
| Title | **GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A.** | | |

released this kit in 2002 rather than 2006, the Court would accept this inconsistency; because Plaintiffs do not allege any additional *facts*, however, the Court is left only with an unexplained factual conclusion in Plaintiffs' amended complaint that contradicts allegations in Plaintiffs' prior complaints. As a result, Plaintiffs' allegations regarding the replacement kit are similarly deficient in demonstrating Defendant's presale knowledge of a purported defect.[19]

### 5. Development of the Next-Generation Model

Finally, Plaintiffs renew their argument—which the Court rejected in its previous dismissal order—that Defendant "apparently corrected" the defect in the "Second Generation models [that] were introduced by [Defendant] beginning with the 2005 model year." (SAC ¶¶ 212.) As the Court explained in detail in dismissing the *Kirsopp* plaintiffs' complaint, No. 14-00496 (Dkt. No. 54 at 18–19), various cases in the Ninth Circuit have suggested that a manufacturer's introduction of a replacement part shortly after the plaintiff's purchase can create the inference that the manufacturer knew of a defect when the plaintiff purchased the product. *See, e.g.*, *Falco v. Nissan N. Am. Inc.*, No. CV 13-00686 DDP MANX, 2013 WL 5575065, at *6 (C.D. Cal. Oct. 10, 2013) (holding that allegations that a manufacturer introduced replacement parts in 2006 and 2007 created the "plausible inferences that [the manufacturer] was aware of the defect at the time they sold the vehicles in 2005 and 2006"). But the gap between the purchases, which occurred at the latest in 2003, and Defendant's actions in 2005 is much wider than the one-year gap discussed in *Falco*. *Cf. Herremans v. BMW of N. Am., LLC*, No. CV 14-02363 MMM PJWX, 2014 WL 5017843, at *18 (C.D. Cal. Oct. 3, 2014) (finding a four-year gap to be "simply too great" to create such an inference). And the court in *Falco* also found "other adequate bases to permit an inference" of presale knowledge that are not present here. *Falco*, 2013 WL 5575065, at *7.

---

[19] Plaintiffs also allege that Defendant "instituted a policy to **deny** all timely warranty claims on the grounds that the cause of the dry exhaust corrosion was 'improper maintenance.'" (SAC ¶ 197.) But in addition to alleging facts supporting the allegation that Yamaha actually had such a policy, Plaintiffs do not explain how such a policy would demonstrate Yamaha's knowledge of a defect that was causing corrosion.

LINK:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | CV 13-05066 BRO (VBKx) | | Date | April 29, 2015 |
|---|---|---|---|---|
| Title | GEORGE WILLIAMS ET AL. V. YAMAHA MOTOR CORP., U.S.A. | | | |

Although Plaintiffs have added more details regarding the improvements made in the second-generation models, the Court finds that Plaintiffs have again failed to demonstrate facts from which the Court can reasonably infer that Defendant had knowledge of a defect before the end of 2003 based on its apparent correction of this defect in 2005. Accordingly, Plaintiffs' final theory of Defendant's presale knowledge also fails. Because demonstrating presale knowledge is a necessary element of each of Plaintiffs' consumer fraud causes of action, *see supra* n.12, Plaintiffs have consequently failed to state a claim with regard to their remaining causes of action. Plaintiffs' complaint must therefore be **DISMISSED** in its entirety.

The Court has now dismissed Plaintiffs' complaint three times.[20] Accordingly, Plaintiffs' claims are hereby **DISMISSED with prejudice**. *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1026 (9th Cir. 2000) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990))).

**IV.    CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's motion to dismiss. Plaintiffs' claims are hereby **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

|  | : |
|---|---|
| Initials of Preparer | rf |

---

[20] In addition, because Plaintiffs amended their complaint pursuant to Federal Rule of Civil Procedure 15(b) and then filed a consolidated class action complaint, the SAC marks the fifth iteration of Plaintiffs' complaint. (*See* Dkt. Nos. 1, 23, 57, 80, 98.)